The FUND OF FUNDS, LIMITED, F.O.F. Proprietary Funds, Ltd., and IOS Growth Fund, Limited, a/k/a Transglobal Growth Fund, Limited, Plaintiffs,

v.

ARTHUR ANDERSEN & CO., Arthur Andersen & Co. (Switzerland), and Arthur Andersen & Co., S.A., Defendants.

No. 75 Civ. 540 (CES).

United States District Court,
S. D. New York.

July 16, 1982.

Cadwalader, Wickersham & Taft, George D. Reycraft, Richard J. Wiener, Haven C. Roosevelt, New York City, for plaintiffs.

Breed, Abbott & Morgan, Edward J. Ross, James D. Zirin, New York City, Wilson & McIlvaine, Charles W. Boand, Chicago, Ill., for defendants.

CONTENTS

| | | |
|---|---|---|
| Statement of Facts | 1326 | 1343 |
| Contentions of the Parties | 1343 | 1345 |
| Subject Matter Jurisdiction | 1345 | 1351 |
| Primary Liability | 1351 | 1354 |
| Aiding and Abetting Liability | 1354 | 1359 |
| Common Law Fraud | 1359 | 1362 |
| Breach of Contract | 1362 | 1365 |
| Jury Instructions | 1365 | 1372 |
| Evidentiary Rulings | 1372 | 1374 |
| Damages | 1374 | 1378 |
| Judgment | 1378 | 1382 |
| Conclusion | 1382 | |

## MEMORANDUM DECISION

STEWART, District Judge:

Plaintiffs brought suit for defendants' alleged violations of the federal securities laws, common law fraud and breach of contract. All of these claims arise out of plaintiffs' investments in natural resource interests (the "overcharge" claims more fully described at pp. 1328–1335 *infra*) and the sale of a portion of a particular investment in the Canadian Arctic used to calculate unrealized appreciation on the remainder of plaintiffs' interest (the "revaluation" claim, *see* pp. 1335 1343 *infra*). The defendants as plaintiffs' accountants and auditors were charged with primary violations of section 17(a) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77q(a) (1976), and section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) (1976), and aiding and abetting violations of those provisions. Subject matter jurisdiction is based upon section 22 of the 1933 Act, 15 U.S.C. § 77v (1976), section 27 of the 1934 Act, 15 U.S.C. § 78aa (1976), diversity of citizenship and pendent jurisdiction.

The case was tried to a jury beginning July 13, 1981. After some 55 trial days and over two weeks of jury deliberation, defendants were held liable for: aiding and abetting violations of section 10(b) of the 1934 Act, and sections 17(a)(1), 17(a)(2), and 17(a)(3) of the 1933 Act regarding the "overcharge" claims; primary violations of section 10(b) and section 17(a)(3) regarding the "revaluation" claims; aiding and abetting violations of section 10(b) and sections 17(a)(1), 17(a)(2), and 17(a)(3) regarding the revaluation claims; and common law fraud and breach of contract regarding both the overcharge and revaluation claims. The jury found that AA was not liable for primary violations of sections 10(b), 17(a)(1), and 17(a)(3) regarding the overcharge claims and that AA was not liable for a primary violation of section 17(a)(1) concerning the revaluation claim.[1] The jury assessed damages for each recoverable overcharge claim at $47,966,079 and for each recoverable revaluation claim at $32,751,763. Following submission of proposed forms of judgment and memoranda, we issued a Memorandum Decision reducing the verdict by the allocable amounts of several prior settlements and awarding prejudgment interest. The Memorandum Decision and judgment entered thereon were sealed because the amount one of prior settlement

---

1. As there was no evidence that defendants obtained any money or property in the offer or sale of securities, we dismissed plaintiffs' claims that defendants were primary violators of section 17(a)(2), 15 U.S.C. § 77q(a)(2) (1976), before submitting the case to the jury. TR 11,364–66, 11,685–86.

included in the calculations was previously sealed.

 Defendants timely moved for a new trial and for judgment notwithstanding the verdict. The standards for deciding these motions are exacting, but not identical. *Hubbard v. Faros Fisheries, Inc.*, 626 F.2d 196, 199–200 (1st Cir. 1980); *Lang v. Birch Shipping Co.*, 523 F.Supp. 1112, 1114 (S.D.N.Y.1981). On a motion for judgment n. o. v., we are commanded not to weigh the evidence or determine the credibility of the witnesses. *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970). We decide whether the evidence could only lead reasonable persons to a conclusion contrary to the verdict. *Sirota v. Solitron*, 673 F.2d 566, 572–573 (2d Cir. 1982); *Hubbard v. Faros Fisheries, Inc.*, 626 F.2d at 199; *Simblest v. Maynard*, 427 F.2d at 4. All reasonable inferences must be made in favor of the party receiving the verdict. *Id.* Thus, we must affirm the verdict if we find sufficient evidence to support the jury's reasonable findings of fact although a different conclusion is also plausible. *See Hubbard v. Faros Fishing, Inc.*, 626 F.2d at 200; *O'Connor v. Pennsylvania R.R.*, 308 F.2d 911, 914–15 (2d Cir. 1962). *See also Planters Mfg. Co. v. Protection Mutual Ins. Co.*, 380 F.2d 869, 874 (5th Cir. 1967), *cert. denied*, 389 U.S. 930, 88 S.Ct. 293, 19 L.Ed.2d 282 (1968). We may grant a new trial in the interests of justice where judgment n. o. v. would not be appropriate. *Id.* at 881, *cert. denied*, 389 U.S. 930, 88 S.Ct. 293, 19 L.Ed.2d 282; *Isley v. Motown Record Corp.*, 69 F.R.D. 12, 16 (S.D.N.Y.1975). We may weigh the evidence on a motion for a new trial "and [we] need not view it in the light most favorable to the verdict winner". *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978). Our object in deciding a motion for a new trial is to prevent a miscarriage of justice or an erroneous verdict. *Id.* We begin, however, with a statement of facts which a jury

reasonably could find in support of the verdict.

### Statement of Facts

#### 1. Parties

Investors Overseas Services, Limited ("IOS, Ltd."), one of the high-flying financial investment vehicles of the 1960's, sponsored and managed mutual funds, among other diversified financial services. IOS, Ltd. was a Canadian company headquartered in Switzerland. Plaintiffs Fund of Funds, Ltd. ("FOF") and IOS Growth Fund, Ltd. ("IOS Growth") were open-ended "offshore" mutual funds controlled and managed by IOS, Ltd. FOF was also a Canadian company, although operations of FOF were directed from Switzerland and corporate records were maintained in Ferney-Voltaire, France. IOS Growth was a clone of FOF, spun-off in December 1969 in response to a change in German law to permit German investors to continue to invest in IOS's mutual funds. IOS Growth received an interest in FOF's assets proportionate to the interest of the German shareholders in FOF before the spin-off—about 4% of FOF's assets. As FOF and IOS Growth have identical interests, claims and positions with respect to the transactions at issue, we shall include IOS Growth in our references to FOF, except where expressly indicated to the contrary.

FOF initially invested in American mutual funds, hence its name. Due to SEC objections, FOF was forced to change its investment strategy in 1967.[1.5] FOF incorporated FOF Proprietary Funds, Ltd. ("FOF Prop") as an umbrella for specialized discretionary investment accounts managed by individual investment advisors. FOF Prop's investments were largely concentrated in American securities. The subaccount advisors were compensated according to both the realized and unrealized (paper) appreciation of their portfolios.

---

1.5. On May 23, 1967, IOS, Ltd. entered into a settlement order with the SEC which required, *inter alia*, that IOS, Ltd. and FOF, reduce their presence in certain areas subject to the jurisdiction of the SEC and comply with securities statutes and SEC rules and regulations in other such areas. Px–22. By the same order, IOS, Ltd. and FOF agreed to cease "all sales of securities to United States citizens or nationals wherever located" with three minor exceptions. *Id.*

After all the transactions pertinent to this suit,[2] FOF, FOF Prop and IOS Growth were placed in liquidation under Canadian law, and John Orr was appointed permanent liquidator.

Defendants are Arthur Andersen & Co. ("AA") and Arthur Andersen & Co. (Switzerland), one of the "Big Eight" accounting firms. AA was employed as the auditor for IOS, Ltd. "and consolidated subsidiaries and affiliated funds". *See* Px–59. The Zurich office was officially responsible for a separate report as to FOF. The pertinent part of the engagement letter for 1968 is as follows:

> Our audit work on companies for which we are responsible will consist of examination of the respective balance sheets and statements of net assets and investments as of December 31, 1968, and the related statements of income, surplus and changes in net assets for the year then ending in order to enable us to express an opinion on the financial position of the respective entities and the results of their operations. These examinations will be made in accordance with generally accepted auditing standards and will include all auditing procedures which we consider necessary in the circumstances. These procedures will include, among other things, review and tests of the accounting procedures and internal controls, tests of documentary evidence supporting the transactions recorded in the accounts and direct confirmation of certain assets and liabilities by correspondence with selected customers, creditors, legal counsel, banks, etc. While certain types of defalcations and similar irregu-

larities may be disclosed by this kind of an examination, it is not designed for that purpose and will not involve the audit of a sufficiently large portion of the total transactions to afford assurance that any defalcations and irregularities will be uncovered. Generally, primary reliance for such disclosure is placed on a company's system of internal control and effective supervision of its accounts and procedures. *Of course, any irregularities coming to our attention would be reported to you immediately.*

Px–59 (emphasis added). The engagement letter for 1969 is identical in this respect. Px–165.

### 2. *Investments in Natural Resource Interests*

In late 1967 and early 1968, FOF decided to establish the Natural Resources Fund Account ("NRFA") as a subaccount of FOF Prop. The object of FOF in investing in natural resource assets was to avoid a potential stock market downturn. At this time, IOS and FOF officers first contacted John M. King ("King"), a Denver oil, gas and mineral investor and developer. In February 1968, a formal investment advisory contract was circulated between Edward M. Cowett ("Cowett"), the Chief Operating Officer of IOS and FOF, and counsel for King Resources Corporation ("KRC"), Timothy Lowry ("Lowry"), designating Regency Products, Ltd. a KRC subsidiary, as investment advisor to FOF Prop. The agreement with Regency was not finalized. No written investment advisory agreement was ever entered into by FOF or FOF Prop.[2.5]

---

**2.** After all the transactions at issue herein occurred, IOS, Ltd. was taken over by Robert L. Vesco and his associates as part of a complex fraud not pertinent to this suit. *See Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 435 F.Supp. 84, 88 (S.D.N.Y.), *aff'd in part, rev'd in part,* 567 F.2d 225 (2d Cir. 1977). Both parties desired to avoid any problems, however remote, that might occur if the irrelevant conduct of Vesco subsequent to the transactions at issue was introduced into the case in a significant way. By agreement of the parties, therefore, every effort was made by counsel, wit-

nesses and the court to avoid reference to Vesco. This effort was quite successful.

**2.5.** Note 3 to the Consolidated Financial Statements of FOF's 1969 Annual Report states that FOF Prop paid performance fees for the NRFA amounting to 10% of the "net realized and unrealized investment gains" to various management companies, all of whom are wholly-owned subsidiaries of IOS, Ltd. Dx B 2. Although the performance fees were purportedly paid pursuant to "investment advisory agreements," there is no evidence of an investment advisory agreement regarding the NRFA. Even assuming the existence of a formal agree-

The establishment of the NRFA was also discussed at a meeting of the FOF Board of Directors in Acapulco, Mexico on April 5, 1968. The minutes of this meeting form a cornerstone of FOF's securities law claims and are reproduced below:

Messrs. John King, Rowland Boucher and James Fredrickson of King Resources Company, Denver, Colorado, were thereupon invited to join the meeting, and to make a presentation to the Directors concerning the advisability of investments by the Company in oil, gas, mineral and other natural resource properties. Mr. King, assisted by Mr. Boucher and Dr. Fredrickson, explained to the Directors the various types of properties that might be suitable for investment. He indicated that such properties were available both within and without the United States, that the return which might be expected from any property increased with the degree of risk involved (so that pure exploration properties would yield the highest return, assuming discovery, and recovery drillings on proven properties would yield the lowest return), and that a proprietary account with an initial allocation of $10 million should be invested in a minimum of 40 properties (so as to spread risk and insure. sufficient diversification of projects). He cited the past record of King Resources Company and of Imperial American and Royal (two publicly offered limited partnerships managed by a King Resources affiliate) to demonstrate that wholly independent of tax considerations (write-off of intangibles, as well as depletion allowance) diversified investment in oil, gas, mineral and natural resource properties could be extremely profitable. He indicated that the role of King Resources with respect to the contemplated Natural Resources Proprietary Account would be that of a vendor or properties to the proprietary account, with such properties to be sold on an arms-length basis at prices no less favorable to the proprie-

tary account than the prices charged by King to its 200-odd industrial and other purchasers.

A general discussion ensued concerning the contemplated Natural Resources Account, during the course of which: (i) Mr. Cowett indicated that tax counsel had approved a procedure whereby the Company could utilize intangible write-offs and depletion allowances of the Natural Resources Account to eliminate all or a substantial portion of the 30% withholding on dividends paid to the Company by registered investment companies and (ii) an investment in diversified natural resources properties was approved by the Directors on an experimental basis, with the initial $10 million allocation to be increased only upon satisfactory performance having been achieved.

. . . .

It was then suggested that, as the number of proprietary accounts grew, it was advisable for each of such accounts to be assigned for liason [sic] purposes to a particular Director of the Company. After a general discussion, this suggestion was adopted, as well as a further suggestion that the Board of Directors of F.O.F. Proprietary Funds Ltd. be expanded so as to include "outside" Directors (particularly those "outside" Directors previously on the Board of the original Proprietary Funds which were registered investment companies), with the expanded Board of Directors of F.O.F. Proprietary Funds Ltd. to serve as a source of advisory boards for each of the Proprietary Fund Accounts. Pending the enlargement of the Board of Directors of F.O.F. Proprietary Funds Ltd., the following Directors of the Company were assigned to perform liason [sic] functions with respect to the following proprietary fund accounts:

| | |
|---|---|
| Edmund G. Brown | Carr Fund |
| C. Henry Buhl, III | Hedge and York Funds |
| Allan F. Conwill | Computer Directions and Douglas Fund |

---

ment, there is ample evidence that no investment advisory services were performed by any IOS, Ltd. subsidiary for the NRFA. The King group dealt directly with Cowett in arranging sales of natural resource interests. Nonetheless, FOF did pay the 10% performance fee and it is an element of the damage award obtained by FOF.

| | |
|---|---|
| Edward M. Cowett | Groo and Real Estate Growth Funds |
| Pierre A. Rinfret | Meid and Technology Funds |
| Eric D. Scott | Natural Resources Fund |
| Wilson W. Wyatt | Alger Fund |

Mr. Cowett was instructed to advise the portfolio managers of each of the proprietary fund accounts of the above assignment.

Px–32, pp. 9–11, 13. FOF authorized formation of the NRFA, initially capitalized at $10 million, and a wholly-owned subsidiary of FOF Prop, Natural Resources Corporation ("NRC"), a Maryland corporation, to invest in oil, gas and mineral properties and interests. NRC had no offices or employees. TR 2981–82, 8861–62. As NRC had no business which would supply funds for its various purchases, funds for investments were supplied from FOF's account at the Bank of New York. TR 2982–83.

### a. King's Relationship with FOF

There was considerable evidence that John King, KRC and other related corporate entities controlled and managed the NRFA in the same manner as other subaccount advisors. *See* TR 979–80, 1921, 2992, 6356, 6982, 8308–09, 10,061, 10,067; Px–83; Px ·121; Px–392. *But see* TR 1919–20; Dx–A–12. The King group frequently characterized itself as an investment advisor to FOF. Px–56; Px–80; Px–87. However, investments in natural resource interests were fundamentally different from other FOF Prop investments in one important particular: in each and every natural resource transaction, the interest purchased was a portion of an interest previously or contemporaneously owned by a member of the King group. *E.g.*, TR 9834–36. AA auditors characterized this arrangement as unusual. TR 2415, 3453.

FOF's investments in natural resource interests were made as follows: (1) the interests would be identified by the King group either in their "inventory" of properties or purchased for resale to FOF;[3] (2) the King group would "ascertain the potential productivity and [make] the determination of the worth of the property" (TR 9868); (3) a representative of KRC telephoned Cowett in Geneva to recommend the interest and to tell FOF the price (TR 9864); (4) Cowett would agree (although he may have had the "power" to turn down an investment, there is no specific evidence that he ever did so and the jury could infer from the evidence that he never did exercise a veto, *e.g.*, TR 9865; *but see*, TR 9296–97); (5) KRC would send a bill to FOF, with copies to Scott, the liaison director between FOF and the King group, and Arthur Lipper Corporation (to value FOF shares initially at the cost of the assets purchased, TR 9865); (6) FOF also received a prospect summary outlining the nature and scope of the acquisition (*e.g.*, Px–613).

The pricing policy followed by the King group was the subject of considerable testimony, most of it interpreting the phrases used in the minutes of FOF's Acapulco meeting at which King represented that "the role of King Resources with respect to the Natural Resources Proprietary Account would be that of a *vendor* of properties to the proprietary account, with such properties to be sold on an *arm's-length basis at prices no less favorable* to the proprietary account *than the prices charged by King to its 200-odd industrial or other purchasers*". Px–32 (emphasis added). Cowett's general understanding of the pricing policy was stated in a memorandum written on April 19, 1968: KRC would offer properties to NRC "from time to time and on a more or less continuous basis", the terms of sale to be "no less favorable than those offered by [KRC] to other non-affiliated purchasers [and] [a]ll transactions will be arms-length in nature". Dx–A–12. Cowett also stated his understanding of the relationship and pricing policy in a letter dated November 11, 1970:[4]

---

**3.** There is evidence that the interests sold by the King group to FOF were purchased by KRC or TCC specifically for that purpose. Px 519. AA knew about this "special inventory" of natural resource interests.

**4.** AA argued that the April 19, 1968 letter fully and accurately expressed the terms of the FOF KRC relationship. *E.g.*, TR 11,147, 11,-180, 11,183, 11,194, 11,249. FOF argued that

It was my express understanding (and, I believe, the express understanding of each of the FOF Directors) that:

a. Without·specific approval, no investment was to be made by the Prop Fund in any resource property, unless KR or affiliated companies had a meaningful investment in the same properties. This was generally understood to be a 50/50 relationship. (However, it was recognized that there would be instances where the Prop Fund had less than a 50% interest, as well as instances where KR, by reason of the limitation of its own resources, would hold less than a 50% interest. In no event was the Prop Fund to have more than a 50% interest.)

b. KR was to have a 12½% "net operating profits" interest in respect of any property acquired by the Prop Fund. (I must confess my own naivete was such that I did not understand the true significance between a "net operating profits" interest and a "profit sharing management" fee.)

c. The prices to be paid by the Prop Fund were to be no higher than what would be paid by knowledgable industry purchasers on a negotiated arms-length basis. (While I understood that KR might *vend* properties out of its *inventory* to the Prop Fund at a *mark-up*, I viewed the standard set forth in the previous sentence as protecting the Prop Fund; and, when I *visualized sales from* "inventory", I was thinking in terms of properties held by KR for a meaningful period of time prior to vending, during which period the values of the properties had presumably appreciated by virtue of intervening events.)

I understood that KR and affiliated companies would, of course, in setting a price to be paid by the Prop Fund for a resource property, add to the direct cost of the property a reasonable amount to cover investigative and administrative costs incurred as a result of the property acquisition program.

I also understood that KR or affiliated companies might perform drilling, coring or other services in connection with property exploration and development; I was specifically advised by John King and/or Rowland Boucher that amounts billed for such work would generally be calculated on a cost plus 7% or 8% profit basis.

I might add that in the last few months I have been advised by IOS personnel that in several instances properties were acquired by KR or affiliated companies one day and vended (either that same day or almost immediately thereafter) to the Prop Fund at a 10 times or 20 times mark-up. Such a practice was clearly contrary to the understandings motivating IOS/FOF to enter into and to continue the relationship with KR.

a. If KR could buy property at $x, this was a clear indication of the value of such property to knowledgable industry purchasers.

b. If a tract of acreage was purchased by KR for $1 an acre, with a "turnabout" vending to the Prop Fund at a price of $10 an acre for 50% of the position, such transaction would fly directly in the face of the underlying concept of KR having a meaningful investment in properties along with FOF. (It was nev-

the November 11, 1970 letter ought to be given greater weight than the April 19 letter. *E.g.,* TR 11,379, 11,382, 11,434. The jury, in weighing this evidence, reasonably could find, as did the court, that the April 11, 1969 letter was of very limited utility. The April 1969 letter primarily concerned the investment advisory relationship and was apparently written to create the impression of FOF's compliance with the 1968 SEC settlement order. The particulars of the April 1968 letter are contrary to all the evidence: (1) there is no proof that there ever was a Natural Resources Management Co., Ltd. ("NRMC"); (2) assuming NRMC formally ex-

isted, there is no evidence that it could or did actively screen NRC's investments; and (3) NRC never dealt with vendors other than King. As far as the pricing arrangements for King's sales to FOF, the April 1969 letter merely repeats the ambiguous provision that transactions were to be at arm's length but at prices no less favorable than those offered by King to other non-affiliated purchasers. By contrast, the November 1970 letter deals primarily with the pricing arrangement, is corroborated by other evidence, and elaborates upon the sketchy terminology of the April 5, 1968 Acapulco minutes and the April 19, 1968 letter.

er intended that FOF have a partner in resource properties who would have a "free ride". We never intended to play a "heads you win, tails I lose" game.)

Px–538. Cowett's understanding of arm's-length pricing thus relies upon market value, including KRC's cost, with appreciation over KRC's cost plus a reasonable profit dependent upon the passage of time and intervening events. The price was not necessarily dependent upon there actually being sales to KRC's 200-odd customers. Testimony was elicited on cross-examination of Conwill that supports Cowett's understanding of the pricing policy, the importance of proportionate investment by the King group in interests sold to FOF and the specific treatment of interests acquired by KRC and TCC for substantially contemporaneous resale to FOF. TR 10,076–95.[5]

5. Q [FOF's counsel] What was your understanding of the basis on which King would sell to Fund of Funds if he bought a property in the morning and sold it to Fund of Funds in the afternoon, and there were no oil or gas strikes over lunch?

A [Conwill, on cross-examination] My understanding was that if there was a significant difference in the price, that I would want management to inquire into the reason if we knew.

Q Did you have a general expectation as to the price that King would charge Fund of Funds under such circumstances?

A If I had been asked what my general understanding was under those circumstances, I would have expected it, barring some explanation which could be made to satisfy our management, that it would be essentially the same, subject to his retention of the net operating profits interest.

Q In other words, for a property bought yesterday morning and sold to Fund of Funds yesterday afternoon, you would expect the same price to be charged to Fund of Funds that King paid for it, subject to the net operating profits interest of 12½ percent, is that correct?

A Not in all instances, sir. I can imagine situations where it would not necessarily be true.

Q But that's the general rule that you expected to be followed, didn't you?

A Generally I would expect that to be the case.

Q Do you recall testifying:

"Now, as to property bought specifically for Fund of Funds, depending on how long he had to hold it or whether he—if he bought it in the morning for X and nothing happened in the morning, and in the afternoon he sold it to us, I would expect to pay X for it less 12½ percent net operating profits interest, or the NOPI."

And that's what you just said.

A Yes, sir.

Q You went on to say assuming there were no oil strikes over lunch.

You agreed with that?

A Yes, sir.

Q Do you recall being asked what your understanding would have been if you extend the matter for a couple of weeks and there is still no oil strikes in between or new seismic or geological data?

Would you still expect that if King purchased a property for X, that he would sell it to Fund of Funds for X subject to the 12½ percent net operating profits interest?

A Generally I suppose that would be, if he had it only for a couple of weeks and there were no other developments, if you assume no other developments or no other knowledgeability on the part of the King organization that would tend to enhance its value.

Q You would expect Fund of Funds to pay X if King had paid X, subject to the 12½ percent net operating profits interest; isn't that correct?

A With my qualification that there is nothing that has come to their attention which enhances its value in the interim.

. . . .

Q . . . And similarly, your understanding is that the board did not know about the markups on the properties, isn't that right?

A That is correct. We did not have any way of knowing what the King costs were.

Q You personally did not know?

A Neither knew nor expected to know.

Q Do you recall testifying that with respect to a sale by King Resources to Fund of Funds, what usually happened would be an almost instantaneous or concurrent acquisition of a property and immediate transfer to Fund of Funds?

A In many instances that was the case. It was not immediate transfer; there was always some time delay. And as I believe I have testified in this case, the procedure typically was for Mr. Boucher to call Mr. Cowett or someone in the King Organization to call Mr. Cowett and say, "we have this available. Do you want it?" or "Do you want your share of it?"

Q Do you recall using these words?

"As I understand it, what usually happened would be an instantaneous or concurrent acquisition of a property and immediate transfer to Fund of Funds."

A I don't recall using those particular words. I could have.

MR. REYCRAFT: Could you show the witness page 347 of his deposition transcript.

Conwill testified that natural resource interests held in inventory might be priced differently than interests bought specifically for resale to FOF. TR 10,080–83. Corn-

A Well, I see it, but I believe I had previously explained what I just repeated here: that the procedure—there would always be some delay. And by "almost instantaneous," I think that would embrace what I had in mind: a telephone call from Mr. Boucher to Mr. Cowett, and Mr. Cowett would say, "I will consider it. Send the invoice." And the invoice would arrive and he would either okay it or not.

Q You did use the words that I quoted to you, did you not?

A Yes, sir.

Q You went on to say, did you not:

"In those instances I believe that the compensation would be limited to the one-eighth overriding interest."

A Yes, sir.

Q You did not expect Fund of Funds to pay more for a property from King Resources than somebody else in the business would have gotten that property from King for?

A No more than somebody else who was an existing customer of King or a from-time-to-time customer of King, what was described to us as industrial customers.

Q Let me give you a hypothetical.

Even if the fair market price of the—fair market value of the natural resource interest was in excess of what King was selling to his 200-odd other industrial customers, you would have expected Fund of Funds to get that lower, most favored nations price, would you not?

A If he offered the same property to us and to others—

Q Yes, sir.

A —I would expect us both to be offered the same price.

Q Even if we would agree that the fair market value of it was in excess of that price?

A Yes, sir, that would be part of what I have described as the most favored nations clause.

Q That's what the most favored nations clause is all about, really, right?

A Yes. We got the same price as was offered to other customers.

Q Did it ever come to your attention that King Resources violated the most favored nations clause?

A No, sir.

Q Do you recall ever testifying that in fact you did find that out?

A I don't recall that, no, sir.

Q I would like to call your attention to the testimony that you gave in another case, pages 1555 through 1557, and read you the questions you were asked:

"Q Did you ever try and determine whether or not Mr. King had violated the most favored nations agreement?"

You answered: "In what time frame, sir? At any time prior to this litigation."

You said: "In the sense that I listened to certain reports by Keplinger & Associates, for one, and others to the extent they can be construed as—with respect to charges made by King, including the assertion that the King organization had on occasion acquired properties one day and on the same day transferred them to us at a highly inflated value, inasmuch as I listened to those discussions and considered them, and that was a function of, among other things, of our outside counsel, Donovan Leisure to look into, I considered whether he complied with the most favored nation treatment in those respects.".

You were asked: "When you learned that King had sold properties acquired the same day at what you have described as a highly inflated price, did you believe that that act violated the most favored nation agreement?"

You said: "Certainly."

You were asked why, and you said, "Because I didn't believe that was the way that he treated his other industrial customers; and if it were, I felt that that was a considerable violation of our reslationship [sic] to the extent that that occurred.

"We were in the process of exploring that at the time that the permanent executive structure and new board of Global Natural Resource Properties was put into place. One reason for wanting skilled executives in the oil and natural gas area for Global Natural Resource Properties was to have them in place so that they could analyze the transactions in depth and decide what action if any was necessary to take against King Resources."

You were asked: "If King overcharged everyone, including the industrial purchasers, why would that violate the most favored nation clause?"

You said: "If that were a practice—and to this date, incidentally, I do not know to what extent in fact that occurred, because the details of that I am confident were pursued by the permanent management of Global Natural Resources Properties when they went into place, and after March of 1971 when I went off the board of Global where I was there only temporarily, I had nothing, no further duties or responsibilities with respect to it, but if that had been the practice at Acapulco, to buy a property in the morning and sell it to us in the afternoon at a grossly inflated price, and if that were a general practice, I suppose that technically you would say Mr. King, that is, I suppose you could generally say that we were getting most favored nation treatment. All the favored nations in that event in my opinion would be treated grossly unfairly.

feld also testified that, as to interests purchased for FOF, KRC's cost would reflect the market value. TR 6333–34.

### b. FOF's Purchases

Beginning immediately after the Acapulco meeting FOF began to purchase oil, gas and mineral interests from KRC. King reported to the FOF Board of Directors on August 2, 1968 that $3,000,000 of the initial authorization of $10,000,000 was committed, with great success to date. Px–44.

In connection with the year end 1968 audit of FOF by AA, the Denver office prepared a "Summary of 1968 Sales to IAMC, Royal and IOS" as of December 31, 1968. Px–95. This document was one of a series of comparisons of prices charged by the King group to FOF, King affiliates and other knowledgeable industry purchasers. E.g., Px–69, Px–143, Px–160; Dx–K–11. The "Summary of 1968 Sales" (Px–95) shows the following with respect to sales to the King affiliates:

| | Current Sales | Current Cost [to KRC] | Current Profit | Profit As A % of Sales |
|---|---|---|---|---|
| Sales to IAMC | $ 9,876,271 | $8,220,324 | $1,655,947 | 16.8% |
| Sales to Royal | 6,566,491 | 4,085,544 | 2,480,947 | 37.8% |
| Sales to IOS | 11,325,386 | 4,307,583 | 7,017,803 | 62.0% |

In the same document, AA also computed the comparative profits for KRC excluding interests sold to Royal and to IOS (really FOF) which carried exceptionally high markups. AA subtracted the Midbar deal from Royal's calculations, which represented almost 50% of gross sales by KRC to Royal in 1968 and returned a 54.6% profit as a percentage of sales, resulting in a net 22.1% profit margin. Five different transactions were omitted in reaching a net profit figure on KRC's sales to FOF. Individually, these transactions showed profits of 98.6%, 98.7%, 56.7%, 58%, and 85.6%. After subtracting these individual sales, however,

KRC's profit as a percentage of sales was over 33%. Thus, AA knew in early 1969 that KRC's sales to FOF were made at significantly higher percentage profits than 1968 sales to King affiliates Royal or IAMC.

KRC's "Consolidated Sales to Industry", dated September 30, 1969, illustrates that KRC's profits on sales to FOF were 68.2%, as compared with average profits on all sales of nearly 36%. Px–143. The comparison is especially stark when we examine only the seven industry customers which purchased over $1 million of interests from KRC. The next highest profit/sales ratio

"Had we known anything of that nature if it existed, and I had no reason to believe that it existed, we would never have entered into any kind of relationship with Mr. King. Also in view of the good faith nature of the relationship, if anything like that were contemplated to occur, it was encumbent [sic] on Mr. King to tell us at Acapulco."

Now, you gave that testimony, did you not?
A I want to say I misconstrued your question.
Q I am sorry.
A You asked me—you are asking if at any time did I consider whether Mr. King had violated the most favored nations clause?
Q If I wasn't clear, I apologize.
. . . .
Q But you did give those answers to those questions at this time, did you not?
A At a date which was much later than I was talking about. I thought you were talk-

ing about during the existence of our Fund of Funds relationship with King Resources.
Q No. In fact, during 1968, 1969 and 1970, you did not know of the overcharge, did you?
MR. ROSS: I object to the form of the question. It has not been established in this case there has been a single overcharge on any property.
THE COURT: Overruled.
A I did not know of any overcharges if they existed, sir.
Q You didn't know the extent of the markup either, did you?
A I had no way of knowing that. I don't believe our management had any way of knowing that unless they inquired on each transaction. We had no procedure set up to inquire as to the costs of the King organization.
Q For whatever reason, you didn't know?
A No.

earned by KRC on sales to such customers (after FOF at 68.2%) was 24.4%; the lowest profit/sales ratio was 5%. KRC earned much higher profits on sales to FOF than on sales to its other non-affiliated customers.

In 1968, KRC sold $11,829,236 worth of interests to FOF, which KRC purchased for $4,855,001; total 1968 sales to other entities by KRC amounted to $34,040,665, and the purchase price of such interests to KRC was $22,673,406.[6] Px–740. In 1969, KRC did $41,259,314 worth of business with FOF, selling interests to FOF which directly cost KRC $13,220,440; sales to other entities of interests purchased by KRC for $48,848,654 totaled $63,379,281. _Id._ In 1970, KRC sold interests which it had purchased for $5,053,-363 to FOF for $14,855,839; sales to other entities amounted to $13,597,575 on interests purchased by KRC for $9,235,812. _Id._

FOF also purchased natural resource interests from KRC's sister company, The Colorado Corporation ("TCC"). TCC had 1969 gross sales to other entities besides FOF of $39,239,060 of interests which it purchased for $26,048,157. Px–745. In 1969, FOF purchased interests from TCC for $13,228,449 which TCC purchased for $3,670,844. In 1970, TCC grossed considerably more on sales to FOF than to other entities: only $238,686 was received from other entities for interests which were purchased by TCC for $91,186, while interests obtained by TCC for $1,522,270 were sold to FOF for $4,202,038.

These calculations were derived from AA's workpapers. Moreover, there is evidence that the King entities built up a "special inventory" of natural resource interests for resale to FOF, Px–519, and that was known to AA.

#### c. AA's Knowledge of the King-FOF Relationship

In addition to auditing FOF, AA audited the King group, including KRC, TCC and John M. King personally. AA's Denver office performed the King audits and did substantial work on the NRFA audit for FOF. TR 1971, 3632–33, 5260–62, 8764. The partner in charge and the manager of the KRC audit held the same positions with respect to the NRFA audit. TR 2883–85, 4629. The NRFA audit was performed by using the records of KRC, TR 1702, 8935, and sometimes AA staffers would work on KRC and NRFA audits contemporaneously. TR 1701–02, 1784. Thus, AA's understanding of the ongoing business relationship between FOF and the King group can be determined from documents found in the AA files for KRC or NRFA and from testimony regarding the actual conduct of the audits. The Denver office did have notice of the investment advisory relationship between KRC and FOF, as described in KRC submissions to the SEC. Px–50, Px–80, Px–87. AA also possessed minutes of an IOS Board of Directors meeting describing the NRFA as "essentially a discretionary account managed by King Resources Corporation". Px–392. During the relevant time period, AA itself noted KRC's "carte blanche authority to buy oil and gas properties for [NRC]", Px–121, _see also_ Px–83, and "quasi-fiduciary" duty to FOF, Px–530. AA also had access to information detailing the King group's costs and profits with respect to FOF. TR 4697–98; Px–66, Px–67.

Additionally, AA was aware of the lack of a written contract evidencing the terms of the relationship between KRC and FOF. TR 8816–17. The Denver office sought con-

---

**6.** The figures for sales to other entities reflected on Px–740 include sales to both affiliates of KRC and non-affiliates. In fact, the average mark-up on KRC's sales of leases to affiliates over the relevant time period was greater than the average mark-up on KRC's sales of leases to non-affiliates. _Compare_ Px–767 _with_ Px–768. The method of calculating damages proposed by FOF and, in large amount, adopted by the jury permitted KRC and TCC to mark-up sales of natural resource interests to FOF by the same percentage as average yearly mark-ups on sales to all other entities. If the jury had not concluded that the most favored nation provision required pricing parity between FOF and all of King's knowledgeable industry customers, but only between FOF and non-affiliates, the average allowable mark-up would have been lower and damages would be higher than under Px–740.

firmation of the nature of any KRC–FOF agreement from KRC for a KRC audit, but did not seek any such information from FOF with respect to the NRFA audit. Although AA's Swiss office received a copy of the Acapulco minutes, see Dx–E–8, it is quite significant that AA's Denver office did not see the minutes, TR 1849, 8535–36, as the Denver personnel were responsible for determining adherence to the pricing agreement.

#### d. AA's Knowledge of the Purchases

By AA's calculation, "[t]he earliest date when anyone employed by Andersen would have become aware of KRC's 1968 sales to FOF was in early 1969", AA Brief at 297, prior to the March 24, 1969 date on Px–95. March 24, 1969 was three weeks before AA's audit report for KRC for 1968 was filed. Px–585. However, it is reasonable to find that AA knew what FOF paid for the interests purchased in 1968, that AA knew what KRC paid for them, and that AA knew KRC's profits, prior to February 5, 1969, when the FOF audit report as of December 31, 1968 was filed. Philip Carr testified that Denver first did some "information gathering" on the NRFA at the request of the New York office for the FOF Prop audit as of December 31, 1968. TR 2884, 3433. Some FOF–KRC transactions were reviewed for the 1968 year end audit by Carr in the Denver office of AA before January 28, 1969. Px–157. Nicholas Constantakis testified that New York and Denver were responsible for NRFA matters for the year end 1968 audit. TR 2286, 2385. Graydon Hubbard testified that the Denver office was first asked to provide some sales documents relating to the year end 1968 FOF audit and that it obtained such documents from KRC. TR 4624, 4627. There is no evidence that the NRFA was audited by AA as of June 30, 1968—although FOF was audited twice yearly—or what such audit showed.

AA viewed King and his companies as a difficult client, posing difficult issues and some risks to AA itself, prior to the year end 1968 KRC audit and as early as 1966. TR 2271, 3415, 3424, 4742.[7] AA also viewed FOF as presenting difficult problems. TR 2303–05. However, the year end 1968 audit is the first instance of AA's actual knowledge of King's sales and profits. See Px–69; Px–95. The Denver office of AA had primary responsibility for audits of the NRFA occurring after year end 1968. This involved scrutiny of the "back-up documents" on NRFA. TR 2142. For the FOF audit as of June 30, 1969, AA's Denver office determined the cost value of NRFA purchases by reference to the KRC books. TR 3438–39. AA did not determine the market value of the NRFA interests for the FOF audit as of June 30, 1969, but did review the valuation as being in accordance with FOF's guidelines, which basically referred the matter of valuations to Rowland Boucher of KRC. TR 3447–53. The FOF financial statements for the periods as of June 30, 1968, December 31, 1968, and June 30, 1969 were unqualified.

### 3. Revaluations

As an open-ended mutual fund, FOF was required to value its investment portfolio on a daily basis. The daily share value was determined by dividing the net asset value of FOF's entire portfolio by the number of outstanding shares. Dx–A–1. FOF redeemed shares on the basis of its daily share value—a value that was too low would undercompensate redeeming shareholders, and one that was too high would overcompensate them. Natural resource interests posed sensitive problems of valuation, due to their speculative nature and the lack of a market for determining current realizable value.

#### a. Fox-Raff

In late 1968, John King arranged with Robert Raff, president of a Seattle broker-

---

7. Some other FOF exhibits illustrate AA's knowledge and concern for King's business practices. AA personnel had repeated, serious difficulties with King as a client at least since 1961. See, e.g., Px–1 to –3; Px–11; Px·14;

Px–16. If dissatisfied with the Denver office's resolution of certain problems, King would speak directly with the highest echelon of the AA partnership in Chicago.

age firm, to sell 10% of a certain natural resource interest owned by FOF to provide a basis for revaluation of FOF's remaining 90% interest. The purchase priced totaled $440,000, with an $88,000 down payment required. However, Raff and his company did not have the money to make the down payment. TR 1311. King advanced Raff the money to make the down payment, TR 1938–39, and assured Raff that no further financial commitment was necessary. TR 1266, 1269–72; Px–499. Without knowing that the Fox-Raff sale was not an "arm's-length" transaction, AA auditors questioned the objective basis for a write-up based upon the short holding period for the interest, the lack of any strikes or new geological information on the area, and doubted whether the 10% sale was sufficient to establish the value of the whole parcel. TR 1916. On the basis of these doubts, AA resolved to "write a letter to the Board of Directors of FOF Prop and FOF pointing out lack of adequate objective basis for unrealized appreciation, lack of disclosure in prospectus, and fact that our passing this unrealized appreciation on the basis of immaterial [sic] doesn't set a precedent for future". Px–77. No such letter was ever sent to the FOF Prop or FOF Boards, or to anyone else.[8] It was also thought by AA to be desirable to have an independent appraisal of the interests. TR 1984. Discussions within the AA ranks concerning Fox-Raff extended to the very highest partnership level. The AA partner working on the year end 1968 FOF Prop audit, John Robinson, was notified in January 1969 by Phil Carr of the Denver office of the fact that the sale to Fox-Raff was not at arm's length because King had advanced the down payment to Raff in the form of a non-interest bearing loan. TR 1928, 1950.

Robinson recorded the conversation with Carr as follows:

> Phil Carr telephoned to say that the $88,000 cash paid to National Resources Corp. at 12/30/68 (20% of contract amount was advanced (non-interest bearing) by King Resources Corp. for a/c of the purchasers because their corporation had not yet been formed. On 1/30/69 (today) allegedly the $88,000 is being paid to King Resources by either the purchaser or the parent of the purchaser (Fox, Raff).
>
> The significance of the above appears to be that the original seller (King Resources), who are now in one or more joint ventures with Natural Resources Corp., advanced on 12/30/68 money (at no interest) for account of new purchaser to old purchaser so old purchaser could within his calendar year (1968) pick up unrealized appreciation and thus increase the earnings and N.A. [net asset] value of the stock of an offshore mutual fund by approximately 4 cents to 5 cents per share.

PX–79. AA never told any representatives of FOF, FOF Prop or IOS that the sale was not bona fide. However, AA determined to treat the transaction as not material to FOF's financial statement, despite its non-arm's length character.[9] TR 1984. The Fox-Raff transaction resulted in a write-up of unrealized appreciation in certain natural resource interests of $820,000 or about 2–½ cents per share, and was reflected in the year end 1968 financial statement of FOF with a footnote to the effect that such a gain was determined by the Board of Directors of FOF. Dx–A–24.

Fox-Raff was also audited by AA. Both Raff and AA workpapers confirm AA's

---

8. AA partner Robinson of the New York office testified that he told the Treasurer of IOS and Cowett that AA could accept Fox-Raff only because it was immaterial. TR 1937, 1981. Although Robinson testified that Fox-Raff was not an "irregularity" within the meaning of the letter of engagement, he deemed it important enough to report to the client (FOF). TR 2014–15.

9. AA's expert witness testified that:

> The auditors would take a long, hard look at any reporting of any sham, no matter what the effect was. The mere fact that it was a sham would be material, and if they knew it. TR 9579–80. Thus, AA's determination not to identify Fox-Raff as a fraud may well have been improper at the time. Although FOF does not claim damages as a result of Fox-Raff, AA's willingness to ignore King's fraud presaged the year end 1969 Arctic revaluation.

knowledge that the investment would be sold within six months, so that Raff would never have to meet the remaining financial obligations to FOF. TR 1297–98; Px–65, Px–107.[10] When FOF pressed for payment, Raff sought and obtained the means to pay FOF from Boucher at KRC. TR 1360–61, 1365–67, 1385–87; Px–139. AA/Denver knew of the prepaid commission chosen by Boucher to provide Raff with the means to pay FOF. Px–209; Px–290.

### b. Development of Guidelines

In connection with a proposed mid-1969 revaluation, FOF informed KRC that AA's Denver office would have "full audit responsibility for the investment account both as to cost and market value" and expected AA/Denver to confirm to AA/New York and AA/Geneva "that they have satisfied themselves as to the cost and market valuation of the investments of NRC as of June 30, 1969." Px–112. Although the prospect of opining on the market values of FOF's investments troubled Phil Carr of AA's Denver office, Px–116, he was informed by the Geneva office that it would not be sufficient merely to disclose the method of valuation if that "does not fairly present the facts." Px–119. It was understood that KRC was establishing values for FOF's natural resource interests. TR 3452–53; 4827; Px–158. Carr did meet with KRC to review the mid–1969 revaluations made by KRC at the end of July 1969. The mid-1969 revaluation totalling $18,884,976, was made by Boucher and supported by an appraisal by J. C. Sproule and Associates, independent Canadian geological and engineering consultants. This fixed the per acre value at approximately $2.00.

In the fall of 1969, AA was asked by Boucher of KRC what kind of sale or documentation was required to support a revaluation of FOF's Arctic interests. TR 8658–59. After this inquiry, AA sought to establish guidelines or "general ground rules" for revaluations based upon unrealized appreci-

ation to provide "substantive independent evidence for reviewing the reasonableness of the client's valuations." A November 7, 1969 memorandum authored by Phil Carr set out AA's proposal:

[A]ny *significant increase* in the value of natural resource properties over original cost to FOF must, for audit purposes, be supported by either:

(1) An appraisal report rendered by a competent, independent expert, or

(2) an arms-length [sic] sale of a sufficiently large enough portion of a property to establish a proportionate value for the portion retained.

Item (2) above is where we currently are not in clear agreement with the client. King Resources Company (Rowland Boucher) has been informed by FOF (purportedly Ed Cowett, Executive Vice President) that sale of a 10% interest in a property would be sufficient for FOF's purposes in ascribing a proportionate value to the 90% retained. This procedure was first used at December 31, 1968, when King Resources Company arranged, on behalf of FOF, for the sale of a 10% interest in an oil and gas drilling prospect and certain uranium claims and leases to Fox-Roff, [sic] Inc., a Seattle brokerage firm affiliate. . . .

. . . .

Since our responsibilities here in Denver with respect to the December 31, 1968, FOF audit consisted only of determining the basis on which King Resources Company determined the valuations (not auditing such values), we discussed this transaction with John Robinson and Nick Constantakis in New York but left any final audit decision up to them. It is our understanding that the King Resources Company valuations determined by the 10% sale were allowed to stand in the final FOF audit report.

. . . .

10. A similar non-arm's length transaction between Raff and King was arranged by King for the "Midbar" property. AA's Seattle and Denver offices knew the salient details of this transaction. TR 1347, 1356–57; Px–62; Px–62A; Px–349. The Seattle and Denver offices discussed the transaction. Px–362.

On the question of what constitutes adequate sales data for valuation purposes (i.e., the 10% question), we have proposed the following to King Resources Company:

(1) *No* unrealized appreciation would be allowed on sales of relatively small percentages of properties to *private investors or others who do not have the necessary expertise* to determine a realistic fair market value. By "relatively small", we envision approximately 50% as being a minimum level in this type of sale to establish proportionate values for the remaining interests. This would preclude any unrealized appreciation on sales such as the December, 1968, sales to Fox-Roff, [sic] Inc. since it could not be reasonably sustained that a brokerage firm has the expertise necessary to evaluate primarily undeveloped resource interests.

(2) Appreciation *would be allowed* if supported by arms-length [sic] sales to *knowledgeable outside parties.* For example, if King Resources Company sold a 25% interest in the Arctic permits to Texaco or another major oil company, we believe it would be appropriate to ascribe proportionate value to the 75% retained. Just where to draw the line on the percentage has not been clearly established. We feel 10% would be a bare minimum and would like to see a higher number.

It appears that we will be faced with a valuation problem along the above lines relatively soon since King Resources Company in September, 1969, has apparently made a sale somewhere in the neighborhood of 10–15% of FOF's interest in a South African diamond property. The buyer is purportedly a Canadian mining company of unknown quality, but probably is not the type buyer in this situation that Texaco would be to an oil and gas property. King Resources Company is proposing to use this sale as the basis for a $3.5 million write-up in FOF's remaining interest, which write-up would be included in their September 30, 1969, valuation reported to FOF.

Both Dee Hubbard and Cal Bennett have been heavily involved in our work to date and will continue to participate rather closely in our future responsibilities for this client. We would certainly appreciate your thoughts on our valuation approach problems, John, after you have had a chance to review the enclosed material.

Px–158. This memorandum was circulated to AA partners March in Chicago (the senior AA partner responsible for audit practices), Evenson in Los Angeles (the regional audit practice director), Robinson in New York, and Tenz in Geneva. A copy was given to Cowett. John March suggested a sale of a "25–30% minimum", a more conservative figure (TR 5512), and stated that it "[m]ust be a cash deal with no take-out option".[11] Px–164. The guideline finally adopted by FOF in the spring of 1970 for inclusion in the 1969 Annual Report was slightly different:

Natural resources

The following sets forth the present guidelines established by the Boards of Directors of the fund and Proprietary with respect to the valuation of natural resource properties. Such guidelines have been consistently followed.

(a) Such properties are carried at cost, until an event of such obvious and compelling significance occurs as to require a change in that value. Discovery of a mineral interest, determination of the property being unproductive through testing or other geological evaluation, or a sale of all or a portion of the property held would be among the factors which would constitute such an event.

(b) A partial sale may be used as a basis for evaluation of unrealized appreciation

11. March testified that he received the Carr memorandum of November 7, mentioning Fox-Raff, TR 5498 -99, but that he could not remember whether the notation "no take-out option" had reference to other "take-out" deals in King-arranged revaluations. TR 5508. The jury reasonably could find that March had Fox-Raff very much in mind in November 1969.

on the remaining holdings when such sale is at arm's length, and when a sufficient percentage of Proprietary's holding is sold.

(c) Outside appraisals are used only in those cases where the Boards of Directors are satisfied that there is appropriate substance to recognition of unrealized appreciation on the basis of appraisal. However, where significant unrealized appreciation is involved, independent appraisals may not be considered sufficient and demonstration of the current realizability of such appreciation through a consummated sale may be required.

Dx–B–2. FOF's guideline does not specify a fixed percentage which must be sold and does not refer to the identity or attributes of a buyer.

### c. Arctic Revaluation

With AA's guidelines in mind, KRC tried to find a major oil company to purchase a significant interest in the Canadian Arctic. KRC was unsuccessful in attempting to sell a 25% interest in the Canadian Arctic to Standard Oil of Indiana in late 1969. TR 4564–65. A subsequent proposal was for FOF Prop to sell 25% of their Arctic interest to an independent group of investors for $50 million cash, resulting in unrealized appreciation of the remainder of FOF's interest of $150 million. Px–170. Finally, King arranged a sale of 9.375% of his group's Arctic interest to third parties in late December 1969 and FOF in essence reimbursed King by selling an identical interest in its Arctic holdings to the King group in January 1970 on the same terms as King's original sale. The 1970 FOF Annual Report details the transaction as consummated:

In January, 1970, Proprietary concluded a sale for its subsidiaries of 10 per cent of their interests in the Arctic permits. This sale was made to the operator of the permit interests on the same bases and terms as a December, 1969, sale by such operator of a 9.375% interest to outside third parties. Sales proceeds consisted of $779,300 cash down-payment and $7,570,000 payable in six semi-annual installments beginning in 1973 and bearing interest at 6% per annum. The sales agreement also relieves the sellers of 80% of the first $10,436,500 of their commitment for exploration costs. The purchasers have thereby assumed an obligation for exploration costs which is $7,305,500 in excess of such costs applicable to their interests in the permits.

Based on the terms of the sale outlined above, and as approved by the Boards of Directors of the Fund and Proprietary, Proprietary has valued its subsidiary's interest in the Arctic permits at $119,000,000. Such value represents a gross valuation of $156,000,000 less, (a) discounting to provide an effective 8½% interest rate on permit payments and an effective 10% interest rate on excess work obligation payments ($20,000,000) and, (b) the 12½% net operating profits interest ($17,000,000). The portion of that valuation applicable to Proprietary is $114,240,000, equal to $10.60 per net acre. After deduction of management fees and income taxes, the Fund's value per net acre is $8.01. Dx–B–2. The cash portion of the sale amounted to approximately 4% of the purchase price.

This sale of FOF's 9.375% interest in the Canadian Arctic to John Mecom and Consolidated Oil & Gas ("COG") was the basis for the $119 million upward revaluation of the remainder of FOF's Arctic interest. Although John King (personally) and Lakeshore Associates (a King affiliate) also purchased some of FOF's interest at the same time, they were not considered by AA in evaluating the transaction.

Mecom, a wealthy Texan who owned U. S. Oil of Louisiana, Inc. was experiencing severe cash flow problems as of December 1969. Mecom lost $11,458,000 for the year ending September 30, 1969, Px–147, and even after he refinanced several loans that were in default in 1968, TR 4262–63, Px–39, faced debts of over $132,000,000. AA audited Mecom from its Houston office, TR 4146, and knew of his cash bind, TR 4149–51, 4272. In February 1968, Leonard Spacek, AA's managing partner, met with King and Mecom to discuss integration of the King

and Mecom organizations, TR 4265–66, Px–29. Spacek also discussed a role for KRC in refinancing Mecom's debts in May 1968 and in December 1968 Spacek discussed the possibility of a King-Mecom joint venture with the Houston office of AA. TR 4272; Px–36; Px–51; Px–61. In late 1969, King was casting about for a purchaser for a portion of FOF's Arctic interest to justify a revaluation. King approached Mecom with a deal that was remarkably similar to the one offered Raff a year earlier. A King employee asked Mecom to purchase an interest in the Arctic. King would provide the $266,000 down payment, TR 3975, and subsequent $10 million in payments would be provided by King's use of Mecom-owned oil and drilling equipment. TR 3969. The King-Mecom deal was consummated on December 24, 1969 and a written side agreement enabling Mecom to make the Arctic purchase was executed:

Dear Mr. Mecom:

This is to confirm my agreement with you in connection with your purchase from King Resources Company of approximately 347,883 net acres of oil and gas exploration permits in the Canadian Arctic Islands for $7.50 per acre plus $7.50 per acre in work obligations under the terms of an agreement with King Resources Company dated December 24, 1969.

I have agreed to provide sufficient net cash receipts to be paid to you to enable you to make all payments on your said contract with King Resources Company through payments due in October, 1971. At any time after October 1971 up to December 31, 1971, I have also agreed that if you so request and assign to me your interest to said permits, I will assume and pay and hold you harmless from all obligation to pay all amounts due King Resources under said contract subsequent to October, 1971. Provided that if, prior to October 1971, you are afforded an opportunity to sell your interests at a price in excess of your costs, my further obligations hereunder shall cease.

This letter will be held for our mutual account by Timothy G. Lowery [sic] of Peterson, Lowry, Rall Barber & Ross of Chicago, Illinois.

Px–193. The final side agreement was different from King's original proposal, but it was a necessary prerequisite to Mecom's participation in the transaction. TR 3959–60; 3968.

COG was a Denver-based oil and gas concern headed by a friend of King. TR 4328, 4522. COG was not a major oil company. TR 4523, 4585–86, 4826–27, 9045. To AA's knowledge, the King entities and COG had previously joined in business transactions. TR 9101–02; Px–385. King arranged a $600,000 loan for COG with a Tulsa, Oklahoma bank, TR 4405, 4474, without which COG would not have entered into the transaction. TR 4375–76. There is conflicting evidence whether COG had a side agreement with King whereby COG "could turn the acreage back to King Resources today if it wished, cancelling all further payments". Px–412. In February 1970 KRC purchased one-half of COG's interest in certain Alaskan property for $15 per acre. Since KRC had rejected such a transaction four months earlier and COG was apparently willing to accept $3 per acre, Px–146, this deal may also support a conclusion that KRC and COG had a side agreement concerning the December 1969 purchase by COG from FOF.

There was considerable discussion within the AA ranks concerning possible qualification of the FOF financials when the magnitude of the proposed revaluation became clear in mid-December 1969. The Denver office did not believe that AA could give an unqualified opinion "on the overall market value of [FOF's] investments at December 31, 1969." Px–172; Px–179. The Denver office, charged with the responsibility of checking the values of FOF's purchases, "tried to emphasize that [their] work [ ] is not necessarily authority for rendering unqualified opinion when natural resources fund becomes [a] material part of FOF." Px–179. Los Angeles-based regional audit practice director Evenson concurred in Denver's assessment. *Id.* The Denver office stressed that it was a policy decision to be

made by March, at AA's home office in Chicago, "whether [the] firm can give [an] unqualified opinion on fund when [a] material part of [FOF's] portfolio is invested in assets which are not valued by an active daily market of sellers selling and buyers buying." *Id.* March's initial reaction was that revaluation of the whole parcel on the basis of a proposed sale of a one-eighth interest for $21,000,000 seemed like "a great deal of maneuvering of values based on very little cash received at the present time." Px–175. Alan Brodd of AA's Geneva office, however, noted that FOF's response to a qualification would be "an explosion" since FOF would follow "the creteria [sic] we have laid down." Px–178. Brodd asked: "What is different now compared to 6.30.69 when amounts were material?" *Id.* It is quite clear that FOF did not want anything in the auditor's opinion which could be interpreted as a negative statement with respect to the revaluation. TR 3040–42, 5529. In response to Brodd, March said that he did not foresee qualification in the usual sense. Px–181. After consultation with various AA partners, the decision was made by March to add the following sentences to the "scope paragraph" of the auditor's report: "Certain investments, in the absence of quoted market prices, have been valued by the Board of Directors as indicated in note ——. These valuations have been reviewed by us to ascertain that they have been determined on the bases described." Px–190. The "opinion paragraph" would commence as follows: "In our opinion, which as to certain investment valuations is based upon the determination referred to in the preceding paragraph, . . .". *Id.* Although March contended that this was a qualified opinion, he did agree that this might not be considered qualified in some technical sense. TR 5534–37. The IOS Growth opinion was not qualified according to prevailing AA and industry standards. Px–598; Px–666.

Although the jury reasonably could find that AA considered the need for an appraisal by an independent geological and engineering consultant as a basis for the Arctic revaluation, TR 3045, 5561; Px–243, no ap-

praisal was made either before or after the transaction was consummated. TR 5562.

AA had no knowledge of the Mecom side deal or the February 1970 KRC–COG transaction, prior to its December 23 interoffice statement between Chicago and Geneva confirming the language that would be used in AA's auditors' certificate for the IOS Growth report. However, it is clear that the "general ground rules" reflected in the November 7 memorandum for revaluation based upon unrealized appreciation were not satisfied and that no appraisal was obtained. Assured that AA would give an unqualified opinion even after the 1969 revaluation, Cowett ordered that the transaction be finalized. TR 3049–50; Px–191. The sale by King was made on December 26, 1969 and the revaluation by FOF was performed that night (a Friday). Px–191. Sales and redemptions of FOF shares at the higher price reflecting the revaluation began immediately.

#### d. Blakely-Wolcott

In 1966–67, KRC engaged in a circular transaction referred to at trial as Blakely-Wolcott: (1) In 1966, KRC sold property to H. J. Blakely for $855,000 and KRC recognized a profit of $760,000; (2) shortly thereafter, Blakely sold the property to Wolcott (later the President of TCC); (3) some two months later, Wolcott conveyed the property to KRC for 50,000 shares of KRC stock. The profit realized by KRC on the Blakely deal constituted almost 40% of KRC's profits for 1966. *See* Px–754. Moreover:

> King had signed a representation letter in 1967 that all transactions of KRC and its officers were arm's length and that KRC's officers and key employees had no material direct or indirect participation in outside business enterprises purchasing from or selling to KRC.

TR 9086–87. In the course of AA's audit of KRC as of December 31, 1967, the Blakely-Wolcott transaction was questioned as "a borderline case of simply writing up property." Px–33. At a meeting between AA and KRC to finalize the KRC year end 1967 financial statements, it was agreed by

Messrs. March, Lawrence and Carr of AA not to require any change in KRC's treatment of Blakely-Wolcott.

> Mr. March took a firm position that had the above transactions all occurred within the same year, a reversal of the profit would be required with the property being recorded at no more than original cost at date sold plus subsequent expenditures. He noted, however, that reversing the profit in 1967 on this transaction would create a charge to income extraneous to actual 1967 operations. Thus, while not specifically approving of the method used to record the transaction, Mr. March concurred with Mr. Lawrence's willingness to live with the Company's accounting as long as we reached satisfactory agreement on the other matters.

*Id.*

Within two weeks after the December 1969 Arctic revaluation was accomplished, Hubbard, the Denver partner in charge of the NRFA and KRC audits, discovered conclusive evidence that Blakely-Wolcott was a fraudulent 1966–67 write-up arranged by King. In auditing John King's personal accounts, Hubbard found a side agreement between King and Wolcott, Px–23, essentially relieving Wolcott of any risk by guaranteeing to repurchase the KRC shares obtained by Wolcott, by guaranteeing a bank loan used by Wolcott to obtain the shares, and by agreeing to employ Wolcott in the King group. Px–221; TR 3403–04; 4540–47. On January 2, 1970, Hubbard sent a memorandum to Evenson and March describing the new information and its significance. Px–221. The side agreement called into question the truthfulness of King's 1966 representation letter.

### e. Issuance of Opinions

The IOS Growth audit report was required to be filed on or before January 31,

1970. TR 2260–61; Px–231. Final decisions on the auditors opinion for FOF's year end 1969 report were not made until late May 1970. TR 5674. AA's audit thus continued after the December 1969 Arctic revaluation and after AA knew about Blakely-Wolcott. AA sought and obtained representation letters from King and Boucher that the Arctic sale was bona fide. Px–262. Although AA obtained representation letters from Mecom and COG confirming the terms of the express purchase agreement, Px–247; Px–248, no inquiry was made of Mecom or COG concerning side agreements, as was made to KRC. TR 4009, 4436. Hubbard also obtained a Dun & Bradstreet report on Mecom. Px–277. In May 1970, prior to issuing FOF's report, AA learned of an article in the Wall Street Journal which cast doubt on COG's obligation. AA thereupon obtained a reconfirmation from KRC, Px–422; Px–432, and Carr personally discussed the matter with COG's principal and obtained a reconfirmation specifically excluding side deals, Px–423, but no further inquiry as to side deals was made to Mecom.

AA's continuing audit of FOF generated additional information regarding KRC's multifaceted relationship with IOS and FOF; in addition to IOS's substantial investments in and with KRC and related companies, at this time KRC became a significant shareholder of IOS. TR 5690.

In late May 1970 AA decided that "subject to" qualification was necessary in issuing its report concerning FOF as of year end 1969.[12] The FOF Directors were so informed in June and July 1970. TR 5700–01. The 1969 auditors' report for FOF reads as follows:

> To the Shareholders and Board of Directors,
>
> The Fund of Funds, Limited:
>
> We have examined the consolidated statements of net assets and investments of

---

12. According to March, "one important development" in AA's decision to issue a "subject to" opinion concerning FOF was a newspaper account of statements made by Arthur Lipper at an IOS meeting in Europe, which could make it appear that AA took responsibility for the valuation. TR 5552–57. March insisted, however, that the language of the IOS Growth opinion was a qualification that could not justify an interpretation that AA was responsible for the valuation of the Arctic interest. TR 5553–54.

The Fund of Funds, Limited (an Ontario, Canada, corporation) and subsidiary as of December 31, 1969, and the related consolidated statements of fund operations and changes in net assets for the year then ended. Our examination was made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances. Investments owned by the Fund at December 31, 1969, were confirmed directly to us by the custodian or brokers. The position of investments sold short was confirmed directly to us by the custodian or brokers. Consistent with past practice, certain investments, in the absence of quoted market prices, have been valued by the Board of Directors as indicated in Note 9. These valuations have been reviewed by us to ascertain that they have been determined on the bases described, but since we are not competent to appraise these investments we do not express an opinion as to such valuations. In our opinion, subject to the effect of certain investment valuations referred to in the preceding paragraph, the above-mentioned financial statements present fairly the financial position of The Fund of Funds, Limited and subsidiary as of December 31, 1969, and the results of their operations and the changes in their net assets for the year then ended, in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year.

Dx–B–2.

### Contentions of the Parties

Having summarized the facts which a jury could reasonably find, it is appropriate and helpful to review the contentions concerning the legal effect of such facts. As the charge stated the parties' contentions, and was reviewed and approved by counsel, it provides the basic arguments of each side. TR 11,673–80.

### 1. Overcharges

With respect to the overcharge claims, FOF alleges misconduct on the part of the King group essentially in two particulars: (1) contrary to the representation that KRC would vend interests to the NRFA on an arm's length "most favored nations" basis, the interests were not sold to FOF at prices that knowledgeable industry purchasers would pay or that King's affiliates would pay (TR 11,374–75), and (2) despite KRC's role as an investment advisor or manager of a discretionary investment account, KRC failed to disclose its purchase prices or markups, in violation of its duty of good faith and honest dealing (TR 11,407–08). FOF contends that AA did not attempt to find out whether KRC's sales to FOF were made as agreed (TR 11,376, 11,410, 11,420), or as required by KRC's position as an investment advisor or manager (TR 11,410–11). Moreover, when the comparative figures of the King group's costs and sales prices became known to AA, AA was allegedly required to disclose such matters to FOF, or to resign at least one account.

AA contends that the FOF Board of Directors was solely responsible for the decisions to invest in various natural resource interests. TR 11,166. As auditors, it is argued that AA properly relied on the minutes of the Acapulco meeting as establishing the agreement of the parties (TR 11,-174–75, 11,181–82), and the agreement reflected in the minutes was not violated: (1) because there were no sales by KRC to non-affiliates of the same or comparable properties (TR 11,154, 11,183–85), and transactions where FOF and KRC's affiliates both purchased interests from KRC appeared to be conducted on the same terms to both parties (Px–767; Px–768); or (2) because FOF paid a fair price for the interests (TR 11,218–27). AA contends that the King group was not an investment advisor to FOF (TR 11,247–53). Additionally, AA argues that it did not know any information concerning FOF's purchases until after they were consummated—after January 1, 1969 for the 1968 sales by KRC and after January 1, 1970 for the 1969 sales by TCC. TR 11,244. Assuming AA had rele-

vant knowledge of King's cost, they contend that the duty of confidentiality prohibited disclosure (TR 11,245) or that FOF's proposed alternative that AA should resign would not have better informed FOF (TR 11,246).

### 2. Revaluation

FOF alleges that a fraudulent upward revaluation of certain natural resource interests in the Canadian Arctic in December 1969 resulted in excessive payments to redeeming shareholders and that an excessive management fee was paid by plaintiffs to IOS. FOF alleges that King arranged non-arm's length, non-bona fide sales of a small portion of the Arctic interests to non-independent third-parties to support a huge upward revaluation of the remainder of FOF's interest. It is further alleged that AA had reason to be suspicious of these specific aspects of KRC-arranged revaluations both prior to and immediately after the 1969 Arctic revaluation was consummated. TR 11,513. Yet AA failed to disclose these matters to FOF. Moreover, FOF contends that guidelines for the revaluation (or at least for a clean auditors' report following the revaluation, TR 11,532-33), were worked out between KRC and AA, and that the final transaction did not satisfy these guidelines, but that a clean opinion was nonetheless issued by AA (TR 11,549). FOF contends that the revaluation would not have been made or subsequently ratified by the Board of Directors without AA's approval of the guidelines and the sale as eventually completed (TR 11,555).

FOF also contends that it relied on AA for a determination of the value of the Arctic interests (TR 11,521). Even assuming that AA did not certify as correct the new valuation, FOF argues that AA's dis-closure of the method of revaluation was insufficient if such method did not fairly present FOF's financial state (TR 11,519, 11,611).

AA's position boils down to a three-stage defense: (1) the FOF Board determined the necessity for a revaluation and the sufficiency of the partial sales (TR 11,297, 11,-301); (2) there was no evidence before the event that the sales were not bona fide, and little available evidence thereafter (TR 11,-261–62); and (3) if the sales to Mecom and COG were infirm, the fair value of the Arctic interests at the time was at least equal to the $8.01 per acre figure achieved by the revaluation (TR 11,256–57, 11,272). AA also challenges the sufficiency of the evidence of AA's intent (TR 11,275).

### 3. Common Law Fraud

FOF argues that the same evidence of defendants' conduct in violation of the securities laws also amounted to common law fraud.

AA's response is substantially similar to their denial of the securities law violations. TR 11,677.

### 4. Breach of Contract

Finally, FOF claims that defendants breached their contract of engagement. The contract specifically required AA to bring to FOF's attention any irregularities discovered in their audit and pledged AA to use due care in conducting their audits in accordance with generally accepted auditing standards ("GAAS"). FOF contends that AA actually did discover numerous irregularities but failed to disclose them. FOF cites most of the GAAS as having been violated.[13] Furthermore, FOF alleges

---

13. FOF contends that AA violated as many as seven generally accepted auditing standards ("GAAS"): (1) AA had a conflict of interest and lacked independence (at least after it learned of the high markups and sales not in accordance with the FOF-KRC arrangements); (2) AA failed to exercise due care (especially with regard to the Arctic revaluation); (3) AA failed to alert FOF to the defects in FOF's internal financial controls and such controls could not be relied on by AA; (4) AA gathered inadequate evidence to support its opinion on the revaluation; (5) in violation of generally accepted accounting principles ("GAAP"), there was inadequate disclosure of the FOF/KRC transactions, the inadequate internal controls, currently realizable value of FOF's assets, the financial weaknesses of Mecom and COG, Mecom's and COG's relationship with KRC, and the degree of risk carried by Mecom

that AA breached another agreement to review the methodology of the revaluation, the arm's length nature of the sales underlying the December 1969 revaluation, and the values arrived at through the revaluation. TR 11,678.

In response, AA denies that the use of the word "irregularities" in the engagement letters includes the conduct at issue, and denies that they breached the engagement letters in any way. AA also denies that there was any agreement obligating them to review the revaluation.

## 5. Damages

The contentions concerning damages were separately discussed in the charge. TR 11,678–80. FOF measures the damages for the overcharge by "the difference between the price plaintiffs paid and either (1) the cost of the natural resource interests to [KRC] and [TCC], claiming that such costs reflected the best evidence of the price [FOF] should have paid for the interests at the time, or (2) the prices charged to other customers of [KRC] or [TCC]." TR 11,678. AA contests the damage issue on the grounds that FOF paid fair prices for speculative interests and that the prices charged to FOF were not higher than prices charged by KRC or TCC to other customers for the same or comparable properties.

As a result of the revaluation, FOF claims that redemptions were made at excessive prices from December 26, 1969 (the date of the revaluation) until August 7, 1970. As the revaluation automatically increased the management fee payable to IOS, FOF also claims the increase in the fee as damage. With respect to the revaluation claim, AA placed primary reliance on FOF's alleged failure to prove that the $8.01 per acre valuation for the Arctic interests was too high; AA's summation termed this the only issue regarding the revaluation. TR 11,256-57. Additionally, AA contends that FOF's Board of Directors was required to

perform the revaluation to maintain current per share values, that the Board did not rely on AA, and that the revaluation did not cause FOF's net redemption posture.

### Subject Matter Jurisdiction

FOF bases subject matter jurisdiction upon section 22 of the 1933 Act, 15 U.S.C. § 77v (1976), section 27 of the 1934 Act, 15 U.S.C. § 78aa (1976), and diversity jurisdiction. The threshold question therefore concerns the applicability of the securities statutes to the conduct at issue. *See generally Williamson v. Tucker,* 645 F.2d 404 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). Specifically, AA's motion challenges our ruling characterizing the natural resource interests as securities as a matter of law and renews its contention that some or all of the transactions at issue were wholly foreign.

### 1. Natural Resource Interests As Securities

We denied summary judgment to AA on the question whether the natural resource interests purchased by FOF from KRC and TCC were securities. Memorandum Decision at 5–10 (December 18, 1980). In submitting the case to the jury, we ruled as a matter of law that the natural resource interests were securities. The 1933 Act defines a security as:

[A]ny note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general,

[A]ny interest or instrument commonly known as a "security", or any certificate

and COG; (6) AA did not reveal all material matters in the financials—including the relationships between IOS and King, and between KRC, Mecom and COG; and (7) it was inappropriate not to qualify the FOF and FOF Prop

financial statements as of December 31, 1968 and June 30, 1969 and a disclaimer or adverse opinion should have been made in the FOF and IOS Growth statements as of December 31, 1969.

of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(1) (1976). The 1934 Act defines a security in somewhat more specific terms as:

[a]ny note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing[.]

15 U.S.C. § 78c(10) (1976). The listed categories are not mutually exclusive, *Tcherepin v. Knight*, 389 U.S. 332, 339, 88 S.Ct. 548, 554, 19 L.Ed.2d 564 (1976); *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943), and the two statutes are viewed as "essentially the same", *Marine Bank v. Weaver*, —— U.S. ——, —— n.2, 102 S.Ct. 1220, 1222 n.2, 71 L.Ed.2d 409 (1982) (*citing United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847 n.12, 95 S.Ct. 2051, 2057 n.12, 44 L.Ed.2d 621 (1975)). The test is a flexible one, based primarily upon the substance of the transaction. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975). "Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." *Marine Bank v. Weaver*, —— U.S. at - ---- n.11, 102 S.Ct. at 1225 n.11.

AA identifies seventeen different categories into which the 64 natural resource interests sold by KRC and TCC to FOF fit, and contends that each category had different characteristics which disqualify them as securities. As we found in our decision of December 18, 1980, however, all of the interests purchased were labeled fractional interests in oil, gas and mineral leases or permits. Nevertheless, AA contends that most of the individual natural resource transactions were not "investment contracts". FOF rests subject matter jurisdiction on several alternative theories: (1) the natural resource transactions were fractional undivided interests in oil, gas or mineral rights; (2) the transactions were investment contracts; and (3) the mutual fund shares issued by FOF and redeemed by FOF are securities.[14]

We begin with the definitional language. *Intern. Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979). The natural resource interests in question are on their face fractional undivided interests in oil, gas and mineral rights. Px–613. *See United States v. King*, 560 F.2d 122, 125 (2d Cir.), *cert. denied*, 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977). FOF did not purchase KRC's or TCC's entire interest in any of the 64 transactions as to which damages are claimed. *See* Px–740; Px–743. This situation falls within the express statutory definition. *Accord Woodward v. Wright*, 266 F.2d 108, 114 (10th Cir. 1959). "[It] is not inappropriate that promoters' offerings be judged as being what they were represented to be." *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 353, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943). We must also look at the purpose of the definition in question and the economic reality of the underlying transaction. Resort to the purpose of the statutory definition bolsters the application of the securities laws to the interests here-

---

14. Our decision on these alternatives makes it unnecessary to decide whether the NRFA was itself a security. However, FOF's position with respect to the NRFA has considerable support. *See, e.g., Jenny v. Shearson, Hamill & Co., Inc.* [1981] Fed.Sec.I..Rep. (CCH), ¶ 97,911 at 90,633 (S.D.N.Y.1981); *Alvord v. Shearson Hayden Stone, Inc.*, 485 F.Supp. 848, 852 53 (D.Conn. 1980); *Troyer v. Karcagi*, 476 F.Supp. 1142, 1147 (S.D.N.Y.1979). AA did not address this contention in its motion papers, although it had previously been raised by FOF.

in. Fractional undivided interests in oil, gas and mineral rights were included in the definition of securities only after Congress analyzed the potential hardship to oil industry development that might occur if this mode of financing was hindered. *Id.* at 352, 64 S.Ct. at 124. It was decided that specific protection was needed for the "form of splitting up of mineral interests which had been most utilized for speculative purposes". *Id.* Applying the basic principles of statutory construction, "courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy". *Id.* at 350–51, 64 S.Ct. at 123. The uncontradicted intent of FOF was to use King's expertise, as it did that of other proprietary account advisors, to locate and purchase speculative investments in oil, gas and mineral assets. TR 6356, 6982. Px ·80; Px ·392. FOF had no means of valuing the assets proposed for investment and no means of participating in any work requirements. From the evidence, as restated in AA's own description and categorization of the interests, it appears that the majority of the separate purchases did not require FOF to perform any work, except possibly to pay for development costs contingent upon successful exploratory wells to be drilled by others. FOF was a money machine. It was not an oil, gas and mineral developer any more than it was a business participant in the various industries in which it purchased common stocks, bonds or notes. FOF's investments were not ordinary commercial financings between knowledgeable industry participants. Thus, one ground for our holding the 64 natural resource assets to be securities is that they were fractional undivided interests of the precise type intended to be included within the express definitional language of the securities laws.

Unlike AA, we do not believe that the courts have cast aside the specific statutory definitions of securities in favor of one all-embracing test. *Golden v. Garafolo*, 678 F.2d 1139, 1144 (2d Cir. 1982). Indeed, the *Intern. Bhd. of Teamsters v. Daniel* decision cited by AA in support of the proposition that the test for an investment contract applies in place of other definitions looked first to § 2(1) of the 1933 Act and § 3(10) of the 1934 Act seeking a specific reference to pension plans. 439 U.S. at 558, 99 S.Ct. at 795. Finding no reference to pension plans, the Court considered respondent's argument "that an employee's interest in a pension plan is an 'investment contract' . . . ." *Id.* The court declined to consider respondent's second alternative argument that an employee's interest constituted a "certificate of interest or participation in any profit-sharing agreement" both because the decision on review was decided solely on the presence of an investment contract [15] and because the investment contract test was at least as broad as the "certificate of interest" definition. *Id.* at n.11. We need not limit our holding to the fractional undivided interest ground, however, as the 64 natural resource interests are securities under the investment contract test stated in *SEC v. W. J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946):

> The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.

A common enterprise exists where the "fortunes of the investors are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties". *United States v. Carmen*, 577 F.2d 556, 563 (9th Cir. 1978); *see also Cameron v. Outdoor Resorts of America, Inc.*,

---

**15.** The decision of the Seventh Circuit not to address the "certificate of interest" claim was based, in part, upon the fact that plaintiff had no writing or agreement evidencing an interest in the pension plan. *Daniel v. Intern. Bhd. of Teamsters*, 561 F.2d 1223, 1230 n.15 (7th Cir.

1977), *rev'd*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). The factual predicate for applying a specific definition was thus missing. In this case, the facts justify reference to the specific definitional language.

608 F.2d 187, 193 (5th Cir. 1979). A "common enterprise" does not require "a pooling of the monies of various investors", or horizontal commonality; "a one-to-one relationship between an investor and an investment manager, that is vertical commonality, is sufficient to create a common enterprise". *Troyer v. Karcagi,* 476 F.Supp. 1142 & nn. 6–7 (S.D.N.Y.1979).[16] The requirement that an investor expect profits solely from the efforts of others has not been read literally, but involves an assessment of the significant managerial or entrepreneurial contribution of the promoter or a third party to the success of the venture. *United Housing Foundation, Inc. v. Forman,* 421 U.S. at 852, 95 S.Ct. at 2060; *Williamson v. Tucker,* 645 F.2d at 418, *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212; *SEC v. Aqua-Sonic Products Corp.,* 687 F.2d 577, at 582 (2d Cir. 1982). General partnerships or joint ventures are unlikely to come within federal securities jurisdiction, as general partners have legal rights and responsibilities for the conduct of the partnership's business, which provides access to information, at least latent control, and some protection. *Williamson v. Tucker,* 645 F.2d at 422–23, *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212. If the facts and circumstances indicate that the substance of the investment belies its form, even general partnerships or joint ventures may be subject to the securities laws:

> If, for example, the partner has irrevocably delegated his powers, or is incapable of exercising them, or is so dependent on the particular expertise of the promoter or manager that he has no reasonable alternative to reliance on that person, then his partnership powers may be inadequate to protect him from the dependence on others which is implicit in an investment contract.

Thus, a general partnership in which some agreement among the partners places the controlling power in the hands of certain managing partners may be an investment contract with respect to the other partners. . . . In such a case the agreement allocates partnership power as in a limited partnership, which has long been held to be an investment contract. A general partner or joint venturer who lacks the business experience and expertise necessary to intelligently exercise partnership powers may also be dependent on the investment's promoter or manager. . . .

A genuine dependence on others might also exist where the partners are forced to rely on some particular nonreplaceable expertise on the part of a promoter or manager. Even the most knowledgeable partner may be left with no meaningful option when there is no reasonable replacement for the investment's manager. For example, investors may be induced to enter a real estate partnership on the promise that the partnership's manager has some unique understanding of the real estate market in the area in which the partnership is to invest; the partners may have the legal right to replace the manager, but they could do so only by forfeiting the management ability on which the success of the venture is dependent. . . . We must emphasize, however, that a reliance on others does not exist merely because the partners have chosen to hire another party to manage their investment. The delegation of rights and duties—standing alone—does not give rise to the sort of dependence on others which underlies the third prong of the *Howey* test. . . .

All of this indicates that an investor who claims his general partnership or joint venture interest is an investment contract has a difficult burden to over-

**16.** AA disputes the presence of a "common enterprise" only on the absence of horizontal commonality. As we find that vertical commonality is the applicable standard, it is not necessary to address AA's argument on this point. We note, however, that some of the natural resource assets had investors other than King, KRC, TCC, and FOF. In fact, the posture of King entities as promoters and investors in all of these assets provides any horizontal commonality that may be required.

come. . . . A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Id.* at 422–24. As with the other definitions of securities, this is not an exclusive standard. The *Williamson* court noted that other factors may "give rise to such a dependence on the promoter or manager that the exercise of partnership powers would be effectively precluded". *Id.* at 424 n.15.

In *SEC v. Aqua-Sonic Products Corp.*, the Second Circuit upheld the application of the investment contract test to an enterprise where investors purchased licenses to sell new dental devices. 687 F.2d at 578. Ultrasonic, a sister corporation of Aqua-Sonic, would be responsible for all sales of the dental products for the benefit of each licensee which accepted the "Offer to Act as Sales Agent." *Id.* at 579. In fact, all 50 licensees accepted Ultrasonic's offer. *Id.* at 580. "None of these licensees had any experience selling dental products." *Id.*

Nonetheless, the licensees had the right to cancel the franchise upon 90-days written notice, had "ultimate control" over pricing, and had the right to inspect the records of the "optional sales agent," Ultrasonic. *Id.* at 579. The court held that the optional nature of the sales agency agreements between licensees and Ultrasonic did not disprove the existence of an investment contract: "it appears that the [*Howey*] Court focused not on whether it was somehow possible for an investor to profit without accepting the option [to service the investor's orange trees], or whether the investor had a bare theoretical right to reject the option, but rather on whether the typical investor who was being solicited would be expected under all the circumstances to accept the option, thus remaining passive and deriving profit from the efforts of others." *Id.* at 582–583. The court also held that formal retention by the investor of the right of control does not preclude a finding of an investment contract, absent some reasonable expectation that investors might exercise their retained rights "in a significant manner." *Id.* at 584–585.

■ The evidence overwhelmingly demonstrates FOF's total reliance upon King, KRC and TCC to find, evaluate and price oil, gas and mineral interests. As previously stated, FOF had no ability to analyze the investments presented to them, no capacity to perform any work requirements, and no intent to be anything but a passive investor.[17] Both FOF and AA stressed King's unique skills—especially in predicting the later meteoric price rise of natural resource assets and in finding or evaluating invest-

---

17. AA argues that Eric Scott, the FOF liaison director assigned to oversee NRFA affairs, was able to analyze the investments and determine whether FOF should exercise its rights as a partner in various separate joint ventures with the King group. AA's position mischaracterizes both the actual and the potential power in Scott's hands. Scott made a two-day trip to Denver to meet KRC and TCC personnel and examine their physical plant. He also received much of the minimal, uninformative documentation that was sent to Cowett concerning the interests KRC or TCC proposed to sell to FOF. That was the full extent of his actual liaison activities. Unfortunately, shortly after receiv-

ing this assignment, Scott had a heart attack and his participation in FOF activities declined. Moreover, there is no evidence that the individual liaison directors were to duplicate management functions or criticize or supervise the performance of the investment account advisors. Indeed, the same meeting at which the liaison function was adopted approved an expanded FOF Board of Directors "to serve as a source of advisory boards for each of the Proprietary Fund Accounts." Px -32. In sum, the limited role played by Scott appears consistent with the ephemeral concept of liaison directors and does not evidence FOF's actual or potential independence from King.

ments. FOF's entire natural resource investment program centered on the participation of the King group. FOF's dependence was induced and encouraged by King, whose own corporate documents represented that KRC was an investment advisor to FOF, and whose prospect summaries barely outlined the geologic and financial information necessary to an informed, independent investment decision. Whatever abstract rights FOF might have had, there is much more than the mere "delegation of duties standing alone" that the *Williamson* court found insufficient to establish the third prong of the *Howey* test.

We conclude that the natural resource interests upon which FOF bases its claim are securities.

### 2. Foreign Transactions

■ We previously considered AA's contention that there is no subject matter jurisdiction over FOF's claims due to the foreign nature of the transactions. Memorandum Decision at 13–16 (Dec. 18, 1980). Without rehashing the rationale of our decision denying AA's motion for summary judgment, the present procedural context requires that we elaborate somewhat on our earlier opinion.

The Second Circuit has considered several transactions in which it was alleged that foreign elements predominate. *See Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir.), *cert. denied sub nom. Bersch v. Arthur Andersen & Co.*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir. 1965) (en banc), *cert. denied sub nom. Manley v. Schoenbaum*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *IIT v. Cornfeld*, 619 F.2d 909 (2d Cir. 1980); *IIT v. Vencap*, 519 F.2d 1001 (2d Cir. 1975); *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972). Nonetheless, a case by case inquiry is required. *E.g., IIT v. Cornfeld*, 619 F.2d at 918.

Most of the purchases by FOF of fractional undivided interests in KRC's or TCC's oil, gas or mineral assets had few foreign elements. FOF and its parent company,

IOS, were Canadian and the natural resource interests were physically located in both the United States and Canada. However, KRC and TCC, the companies that sold the natural resource interests to FOF, were American companies. Although the formal relationship between King and FOF was embodied in the minutes of a Board of Directors meeting which took place in Acapulco, the ongoing relationship which was established was conducted by the King group at their Denver office and through Denver personnel. KRC and TCC created the fractional undivided interests purchased by FOF by subdividing their own interests. Every individual purchase by FOF followed King's review and recommendation in the United States. A Maryland shell corporation, NRC, was the conduit for FOF's purchases and the funds were supplied from the Bank of New York. Title to the underlying properties and daily management control remained with KRC or TCC even after sale. With regard to the various revaluations, the entire scheme was carried out by King in conjunction with other domestic companies; the interests were allegedly purchased by Fox-Raff, Mecom, COG, Lakeshore, and Blakely-Wolcott. The guidelines for the revaluation were worked out by AA in Denver, Chicago and New York. FOF played almost no role in structuring the revaluations.

In two specific instances, however, the transactions involved a foreign subsidiary of King, International Resources, Ltd. ("IRL"). In this regard, the instant case appears most similar to *Leasco*. In *Leasco*, meetings and negotiations at which numerous misrepresentations were made took place in the United States between a United States company, Leasco, and an English company, controlled by Maxwell. 468 F.2d at 1330. An agreement to commence a tender offer in England was reached between Leasco, the purchaser, and Maxwell, the seller, in the United States. *Id.* at 1332. The purchases that followed were not made by Leasco, however, but by a Netherlands Antilles subsidiary of Leasco, "N.V.", on the open market in England. *Id.* The Second

Circuit held, "when substantial misrepresentations were made in the United States", Congress "wished to protect an American investor if a foreigner comes to the United States and fraudulently induces him to purchase foreign securities abroad". *Id.* at 1337. Although N.V. was formally the purchaser, "it would be elevating form over substance" to permit this transaction to avoid federal securities laws as N.V. was "part and parcel of Leasco in every realistic sense [and] Leasco remained at all times intimately involved in the transaction; the foreign entity was accepted by both sides as the *alter ego* of the American". *Id.* at 1338. A similar principle animates *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1974). The Second Circuit stated that Congress did not intend "to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners". *Id.* at 1017. The court limited the breadth of the holding to situations where the fraudulent acts themselves, and not merely preparatory acts, occur in the United States. *Id.* at 1018.

The IRL transactions involving the CSADC African diamond interests and Port Gentil Gabon, natural resource interests must be considered in the context of the ongoing managerial and advisory relationship between KRC, TCC and FOF. FOF was not looking to IRL, but to KRC in making its purchase: (1) IRL was a wholly-owned subsidiary of KRC; (2) KRC's Denver office and personnel were involved in the IRL transactions; and (3) payment was made by FOF in the same manner and sent to the same place as in transactions with KRC.

An issue in this case even more critical than the conduct of the King entities was the conduct of AA in providing accounting services to parties intimately involved in all phases of the case on both sides of every relevant transaction. AA audited KRC, TCC, and John King personally, and performed substantial services for FOF, IOS, and NRC in Denver, Chicago, and New York. The partner and manager in charge of the KRC audit in Denver also audited FOF's natural resource subaccount, in part using KRC's records. The Denver office performed substantial work on the natural resource interests, in coordination with the Swiss office of AA, which reviewed matters at IOS headquarters and FOF's executive offices in Ferney-Voltaire, France. AA also audited Raff and Mecom through AA's Seattle and Houston offices respectively. While AA's activities could not provide subject matter jurisdiction where none previously existed, they are among the weighty United States contacts which support the exercise of jurisdiction in this case.

### Primary Liability

AA was found to be a primary violator of section 10(b) and section 17(a)(3) only with respect to the revaluation claims.

### 1. Section 10(b) and Rule 10b–5

 Section 10(b) of the 1934 Act prohibits the use "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivances" and authorizes the SEC to prescribe rules and regulations enforcing the statutory stricture. To that end, Rule 10b–5 makes it "unlawful for any person,[18]

---

**18.** AA's argument that an accountant cannot be a primary violator of section 10(b) is without merit. First, Rule 10b–5 applies by its terms to any person who, directly or indirectly, schemes to defraud or engages in an act or course of conduct constituting fraud. Second, controlling cases and other private actions recognize a cause of action against accountants as primary violators. *Sharp v. Coopers & Lybrand*, 457 F.Supp. 879, 887 (E.D.Pa.1978), *aff'd*, 649 F.2d 175, 184 (3d Cir. 1981) (Coopers & Lybrand was held liable on the basis of respondeat superior for a non-partner's primary

fraud); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 378 F.Supp. 112, 121 (S.D.N.Y.1974), *aff'd in part & rev'd in part*, 540 F.2d 27 (2d Cir. 1976); *Seiffer v. Topsy's Intern. Inc.*, 487 F.Supp. 653, 667 (D.Kan.1980). Third, accountants have been held liable as violators in actions by the SEC. *SEC v. Coffey*, 493 F.2d 1304, 1315 n.24 (6th Cir. 1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); *SEC v. Senex Corp.*, 399 F.Supp. 497, 507 (D.Kan.1975), *aff'd on other grounds*, 534 F.2d 1240 (6th Cir. 1976).

directly or indirectly ... [t]o employ any device, scheme or artifice to defraud, [or] to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person". 17 C.F.R. § 240.10b–5 (1981). The elements of a 10(b) cause of action are: (1) a factual misrepresentation or an omission to state facts necessary to make statements not misleading; (2) materiality; (3) scienter; (4) reliance; and (5) causation of injury. *E.g., Huddleston v. Herman & MacLean*, 640 F.2d 534, 543 (5th Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 1766, 72 L.Ed.2d 173 (1982).

In this case, the jury reasonably could find that AA undertook special duties in connection with the revaluation. AA was initially contacted by KRC concerning the revaluation. AA, in conjunction with King, established guidelines for accepting partial sales as a basis for writing-up the value of interests to reflect unrealized appreciation. FOF's interest was merely to do whatever satisfied AA. Thus, FOF's basic guidelines mirror AA's. It was AA's responsibility to determine whether the proposed revaluation would, in fact, satisfy FOF's guidelines as being arm's length in nature and involving "a sufficient percentage" of FOF Prop's holding. The FOF Board exercised little or no supervision of this process. AA had considerably more stringent ground rules for determining whether a revaluation based on a partial sale fairly presented the financial picture of FOF than the general statement of FOF's guidelines made in the 1969 Annual Report. All of the internal AA deliberations leading up to the December 23 telex reciting the proposed language for the IOS Growth opinion suggested that AA could not accept less than a 10% sale, 4% cash, and no appraisal as a basis for recognition of unrealized appreciation. AA's agreement in December 1969 not to qualify the IOS Growth report as of December 31, 1969 including the revaluation was an affirmative representation that the revaluation was at arm's length and involved a sufficient percentage of FOF Prop's holding in accordance with FOF's guidelines and that the financial statements fairly and accurately portrayed IOS Growth's position as of year end 1969. In both particulars, the jury reasonably could find AA's statement to be false or misleading. Additionally, both the IOS Growth and the FOF "subject to" opinions published in the 1969 Annual Reports state that the revaluations were reviewed by AA to determine that they were made in accordance with FOF's guidelines. This is misleading insofar as AA actually doubted or had every reason to doubt the arm's length character of the sales and the sufficiency of the partial sales as evidence of the value of the remainder of FOF's interest. The auditor's opinion is also misleading in stating that AA did not express an opinion as to the value of the interests. There is evidence that FOF relied almost entirely on KRC to value the interests and upon AA to confirm the fair accuracy of the value as fixed.

The purpose of the partial sale was known to AA to be the valuation of FOF's mutual fund shares which were freely purchased or redeemed at a price equal to the fund's net asset per share. The effect of the revaluation upon the fund as a whole made it clearly material. There is a substantial likelihood that a reasonable investor would consider this important in deciding whether to sell or purchase FOF shares. *See TSC Industries v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (considering materiality in proxy context). AA's brief does not contest the materiality of the revaluation.

Scienter may be shown by AA's actual intent to deceive or defraud, knowledge of the falsity of its representations or recklessness. *Rolf v. Blyth Eastman, Dillon & Co.*, 570 F.2d 38 at 44–46, *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698; *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1300–02 (2d Cir. 1973) (en banc). A reckless misrepresentation, or reckless omission to state information necessary to make that which is stated not misleading, is one which disregards the truth or falsity of the information disclosed in light of a known danger

or patently obvious danger. *Rolf v. Blyth Eastman, Dillon & Co.*, 570 F.2d at 45, 47, *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (*quoting* W. Prosser, Law of Torts § 107 at 700 (4th ed. 1971)). This is consistent with the holding of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976), that liability under section 10(b) cannot be based upon negligence. *Rolf v. Blyth Eastman Dillon & Co.*, 570 F.2d at 45 n.12, *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698. The jury reasonably could find that, at a minimum, AA did not have ample information concerning the arm's length character of the partial sales supporting the revaluation to commit itself to an unqualified opinion for IOS Growth in December 1969. Moreover, AA knew all the facts which reasonably suggested that the methodology and result of the 1969 Arctic revaluation was a sham and yet AA persisted in the misleading and incomplete disclosures outlined above as to the IOS Growth and FOF audit opinions. Finally, AA disregarded its affirmative duty to disclose to FOF material fraud discovered in its audit. It was reasonable for the jury to conclude that AA acted with requisite scienter in disregarding known and obvious risks to FOF by agreeing to issue an unqualified opinion as to IOS Growth and subsequently issuing the misleading IOS Growth and FOF auditor's opinions.

FOF would not have made the sales resulting in the revaluation without AA's review of the methodology and issuance of a clean opinion for IOS Growth regarding the outcome of the December 1969 Arctic revaluation. Accordingly, AA's contention that the formal issuance of the auditor's opinion after the FOF Board approved the sales and revaluation precluded any claim of reliance is without merit. AA's alternative argument that disclaimer of its ability to appraise the investments in the auditors' opinions precluded reliance is unavailing. It is not claimed that AA computed the value of the interests sold. The disclaimer does not undercut FOF's reliance on the fact that AA had to have some basis for determining that the revaluation met FOF's guidelines and fairly presented FOF's financial picture. We leave the question of loss causation to the discussion of damages.

### 2. Section 17(a)(3)

Section 17(a)(3) of the 1933 Act makes it unlawful for any person "in the offer or sale of any securities . . . to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser". Section 17(a)(3) thus parallels Rule 10b–5(c) except for the requirement in 17(a)(3) that the violation occur in the offer or sale to a purchaser. Section 17(a)(3) is narrower than section 10(b)'s "in connection with" standard, and AA contends that section 17(a)(3) is strictly limited to violations by offerors or sellers of securities. Federal courts at all levels have agreed with AA that § 17(a) is limited in its application to offerors or sellers. *Aaron v. SEC*, 446 U.S. 680, at 687, 100 S.Ct. 1945, at 1950, 64 L.Ed.2d 611; *Globus v. Law Research Serv. Inc.*, 418 F.2d 1276, 1283 (2d Cir. 1969), *cert. denied* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 94 (1970); *SEC v. First Financial Group*, 645 F.2d 429, 436 n.12 (5th Cir. 1981); *Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 1194, 1196–97 (6th Cir. 1981); *SEC v. Allison*, [Current] Fed.Sec.L. Rep. (CCH) ¶ 98,427, at 92,550 & n.6 (D.Ore. 1982); *In re North American Acceptance Corp. Securities Cases*, 513 F.Supp. 608, 618 (D.Ga.1981). Although AA "was not a 'seller' in the most common sense of that word, that is, [it] was not the party who parted with the securities sold and received the consideration given in exchange", *Lewis v. Walston & Co., Inc.*, 487 F.2d 617, 621 (5th Cir. 1973), the securities laws include as a seller entities which proximately cause the sale, *id.* at 622, or whose conduct is "a substantial factor in causing a purchaser to buy a security". *Lawler v. Gilliam*, 569 F.2d 1283, 1287 (4th Cir. 1978).

FOF properly claims the status of a purchaser of securities owing to the redemption of its own mutual fund shares.

But there is no basis in this record for finding AA to be a seller. AA was not an agent for the redeeming shareholders and did not promote the redemptions. In fact, there is evidence of significant exogenous economic factors inducing FOF's shareholders to cash in their investments. As an open-ended mutual fund, FOF was required to redeem shares presented to it.

██ Although AA's conduct with respect to the revaluation was causally related to the price rise in FOF's shares, extending liability to the auditors of a mutual fund because their decisions affect the market price of the outstanding shares simply goes beyond the purview of section 17. Accordingly, we grant judgment notwithstanding the verdict on AA's primary liability under section 17(a)(3).

### Aiding and Abetting Liability

██ The jury found AA liable for aiding and abetting violations of section 10(b) and all subsections of section 17(a). As we believe that controlling precedent provides a private right of action for FOF under both section 10(b) [19] and section 17(a) [20], we shall

---

19. AA contends that only sellers of securities, and not purchasers, have a private right of action under section 10(b). The cases and language to the contrary are legion. *E.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730 ·32, 747, 95 S.Ct. 1917, 1922–23, 1931, 44 L.Ed.2d 539 (1975); *Mallis v. FDIC*, 568 F.2d 824, 830 (2d Cir. 1977), *cert. dismissed*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978); *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 463 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). Aiding and abetting liability under section 10(b) is also well established. *Rolf v. Blyth Eastman Dillon & Co., Inc.*, 570 F.2d 38, 44–47 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *ITT v. Cornfeld*, 619 F.2d 909, 927 28 (2d Cir. 1980).

20. AA contends that recent Supreme Court cases and Second Circuit precedent leave the issue of a private right of action under section 17(a) an open question. The Supreme Court does consider the issue of a private right of action under section 17(a) to be unsettled. *E.g., Intern Bhd. Teamsters v. Daniel*, 439 U.S. 551, 557 n.9, 99 S.Ct. 790, 795 n.9, 58 L.Ed.2d 808 (1979). The Second Circuit, however, has expressly ruled that a private right of action under section 17(a) does exist. In *Kirshner v. United States*, 603 F.2d 234 (2d Cir. 1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), the Second Circuit adopted the holding of the Seventh Circuit in *Daniel* "that the language of section 17 is broad enough to imply a private right of action". *Id.* at 241. In a subsequent case, another panel of the Second Circuit overlooked *Kirshner* in its initial decision and stated that the question whether section 17 provides a private right of action was "as yet undecided in this circuit". *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028 (2d Cir. 1979). An amendment to the *Wigand* decision recognized *Kirshner* as controlling precedent, although it concluded that the case did not present any issue under section 17 on appeal. *Id.* at 1038.

Since *Kirshner* and *Wigand*, several opinions in the Southern District have granted private rights of action under section 17. *Anschutz Corp. v. Kay Corp.*, 507 F.Supp. 72, 75 (S.D.N.Y.1981) (Lasker, D. J.); *Steinberg v. Carey*, 470 F.Supp. 471, 475 n.13 (S.D.N.Y.1979) (Weinfeld, D. J.); *but see Marbury Management, Inc. v. Kohn*, 470 F.Supp. 509, 514–15 n.9 (S.D.N.Y. 1979) (Gagliardi, D.J.) (no citation to either *Kirshner* or *Wigand*), *modified on other grounds*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980); *In re New York City Municipal Securities Litigation*, 507 F.Supp. 169, 187 (S.D.N.Y. 1890) (Owen, D.J.) (no private right of action against municipal issuers under section 17); *Eriksson v. Galvin*, 484 F.Supp. 1108, 1127 (S.D.N.Y.1980) (Tenney, D.J.) (no right of action under section 17 qualified by the holding that even if such a right existed, plaintiff failed to prove a case; no mention of either *Kirshner* or *Wigand*).

The holding of the Second Circuit that a private right of action exists under section 17 is in accord with the Seventh and Fourth Circuits, *Lincoln Nat'l Bank v. Herber*, 604 F.2d 1038, 1040 n.2 (7th Cir. 1979); *Newman v. Prior*, 518 F.2d 97, 99 (4th Cir. 1975), but clashes with the Eighth Circuit, *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 159 (8th Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). Given a private damage remedy for section 17(a) violations, there seems little point in denying that one who aids and abets a section 17(a) violation is liable as a principal violator. Civil damage cases generally recognize aiding and abetting causes of action under section 17(a). *City Nat'l Bank v. Vanderboom*, 290 F.Supp. 592, 608–09 (W.D.Ark.1968), *aff'd*, 422 F.2d 221 (8th Cir.), *cert. denied*, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970); *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 144 (7th Cir. 1969), *cert. denied*, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969); *Resource Investors Group v. Natural Resource Investment Corp.*, 457 F.Supp. 194, 200, (D.Mich.1978). SEC injunction actions

examine the sufficiency of the evidence. Neither party disputes the elements of the test for aiding and abetting: (1) fraud by the primary party (here the King group); (2) scienter of the alleged aider and abettor; and (3) substantial assistance by the alleged aider and abettor. *IIT v. Cornfeld*, 619 F.2d at 922.

### 1. Overcharges

#### a. Primary Fraud

To prove a primary fraud, FOF was required to show that King's conduct satisfied all the elements of a primary securities law violation. On this motion, however, AA challenges only the proof that King made an untrue statement of a material fact to FOF or failed to disclose material information necessary in order to make the statements that were made not misleading. Over 50 pages of AA's 640-page unsealed Memorandum of Law reviewed the evidence on this issue. The evidence supports a finding that King committed a primary fraud. The jury reasonably could find that the most favored nation pricing provision announced by King at the Acapulco meeting on April 5, 1968 was materially misleading and without substance. FOF claimed that comparable interests were not sold to them by King at prices that knowledgeable industry purchasers would pay or that King's affiliates would pay. If KRC or TCC did not sell interests in comparable properties to any purchasers except FOF and KRC's affiliates, and the most favored nation provision applied to non-affiliated, knowledgeable industry purchasers, King's statement was materially misleading. If none of the interests vended to FOF were comparable to interests sold by KRC or TCC to any other customers, it was materially misleading to fail to tell FOF that no effective pricing protection was implied. Of course, if the interests sold to FOF were comparable to those sold to affiliates or knowledgeable industry purchasers and the prices charged to FOF were higher than

those paid by such parties the most favored nation provision was violated. AA contends that audit tests did show that sales of interests in the same properties to FOF and affiliated parties were made on the same terms. Px–160; Dx–K–11. However, the most favored nation provision is not limited to sales of the same properties, nor is it necessarily limited to sales to affiliates. AA's test is not conclusive as to either their knowledge or intent.

Alternatively, the jury could find that the April 5 representations did not constitute the entire agreement of FOF and King. There is evidence that FOF was led to believe that the King group would have "a meaningful investment in the same properties" as FOF—which is obviously not the case if interests are sold to FOF at prices which effectively eliminate KRC's or TCC's risk. There is also evidence that the FOF–King agreement contemplated purchase prices set at KRC's cost for interests purchased by KRC for immediate resale to FOF and cost plus appreciation where time or intervening events justified an increase in value. Thus, the inadequate disclosures to FOF in each offering of interests by the King group would be materially misleading. Most important of the representations not recorded in the April 5 minutes is the assumption by the King group of investment advising or discretionary investment management responsibilities for FOF. As an investment advisor or manager of FOF's discretionary natural resource investment account, the King group would have a duty to act in FOF's best interests and avoid a conflict of interest. It is not necessary to decide whether the King group would have to disclose its costs per se, or the non-comparability of the interests sold to various purchasers (the lack of protection of the most favored nation provision) or other factors affecting the value of the interests (*i.e.*, the holding period, discoveries on surrounding acreage, etc.) required to permit FOF to make an intelligent investment decision in

under section 17(a) also invoke aiding and abetting. *E.g., SEC v. Coven*, 581 F.2d 1020, 1025·26 (2d Cir. 1978), *cert. denied*, 440 U.S.

950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979); *SEC v. National Student Marketing Corp.*, 457 F.Supp. 682, 712–14 (D.D.C.1978).

dealing with KRC or TCC as vendors, as they did not make any such disclosures. It is enough that a person with a duty to speak fails to do so. *Chiarella v. United States*, 445 U.S. 222, 230, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980).[20.5] The evidence also permits the inference that King had the requisite scienter, and that the elements of reliance and causation were well-established, to constitute a primary fraud.

### b. AA's Scienter

■ An accountant's liability for aiding and abetting securities fraud may, at the very least, be predicated upon "actual knowledge" of the fraud. *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 575. *See Edwards & Hanley v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478, 484–85 (2d Cir. 1979) (*quoting Woodward v. Metro Bank*, 522 F.2d 84, 97 (5th Cir. 1975)). AA can be found to have actually known that the prices charged to FOF by KRC or TCC were inconsistent with the most favored nation provision insofar as it provided for pricing parity of FOF and King's other knowledgeable industry purchasers (both affiliated and non-affiliated). Alternatively, AA's actual knowledge of a primary fraud may be inferred from its belief that the King group was an investment advisor to FOF, its recognition of the high markups on interests sold to FOF, and its knowledge of the terms revealed to FOF prior to its purchase.

■ Although recklessness suffices to establish scienter for primary violations of section 10(b), *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 575 (*citing IIT v. Cornfeld*, 619 F.2d at 923), it is not clear that recklessness satisfies the scienter element of an aiding and abetting claim absent a fiduciary duty owed by the alleged aider and abettor to the defrauded party, *id.* (*citing Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d at 44 & n.9, *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698). Judge

Gurfein wrote in *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, that "something closer to an actual intent to aid in the fraud" is necessary in an aiding and abetting context without any fiduciary relationship. 602 F.2d 478, 485 (2d Cir. 1979); *see also Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111 at 120 (2d Cir. 1982). Courts do not generally regard the accountant-client relationship as a fiduciary one. Nonetheless, a recklessness standard has been applied to accountants whose audit or opinion letter is allegedly misleading, in an action by third parties whose reliance upon such pronouncements is foreseeable. *Oleck v. Fisher*, [1979 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 96,898, at 95,699 (S.D.N.Y. 1978), *aff'd*, 623 F.2d 791 (2d Cir. 1980); *In re Investors Funding Securities Litigation*, [1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,717, at 98,763 (S.D.N.Y.1980). In *Oleck v. Fisher*, both the District and Circuit Courts referred to the accountant's duty to disclose as triggering application of a recklessness standard. [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,898 at 95,699, *aff'd*, 623 F.2d 791. We recognize, however, that the auditor's duty of disclosure is ordinarily circumscribed by the auditor's limited responsibilities:

> The relationship itself is occasional. The auditor's access to information about the firm depends to a greater or lesser degree on the firm's producing documents under its control. The auditor's benefit from the relationship consists in a fee for professional services. While the auditor may know that persons dealing with the firm and the firm's own directors will rely in some ways on the audit opinion, rarely if ever can the firm itself be expected to base investment decisions on what an audit reveals. *See Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811, 815 (2d Cir. 1975). Reckless disregard of this narrow duty is conduct of an extreme sort and should be found sparingly. . . .

---

**20.5.** Identification of material misrepresentations or omissions distinguish this case from *Santa Fe v. Green*, 430 U.S. 462, 474, 475 n.15, 97 S.Ct. 1292, 1301, 51 L.Ed.2d 480 (1977),

relied on by AA for the proposition that mere breach of fiduciary duty in connection with a securities transaction is not actionable under section 10(b). *Id.* at 472, 97 S.Ct. at 1300.

*Pegasus Fund, Inc. v. Laraneta*, 617 F.2d 1335, 1340–41 (9th Cir. 1980). Nonetheless, AA's conduct under the unusual circumstances of this case easily meets a recklessness test.

The investment strategy of FOF Prop—to establish a series of discretionary accounts with investment advisors—was well-known to AA. Although some deviation from this course was conceivable, the baseline relationships one could reasonably expect to find or to test for would be an investment advisor-advisee relationship. Indeed, King's relationship to FOF was proposed to be structured in this fashion and, in fact, largely conformed to this pattern. Everywhere one turned, however, there were conflicting signals about the relationship. The King group was an advisor, then it was not. An IOS subsidiary was the advisor, but FOF made the investment decisions and neither FOF nor IOS had any geological expertise, or, more important, any information on which to base an informed, independent investment decision. The records at FOF were so scanty that audits were performed at the Denver headquarters of KRC based upon KRC records. The jury could find that the offer of natural resource interests by KRC or TCC and the acceptance by FOF was a mere formality. Even the minutes of the April 5, 1968 Acapulco meeting are ambiguous.

To perform its audit, AA had to determine FOF's internal accounting procedures, the relationship between the King group and FOF, and the purchase procedures. Yet AA asked the King group and did not ask FOF although FOF, and not King, was the relevant client. Moreover, AA failed to check King's answers with FOF. The jury reasonably could find that AA's conduct was a gross breach of its obligation to FOF under GAAS, GAAP and the letter of engagement. Although FOF management bears primary responsibility for business decisions, the auditor must inform the client when the basic terms of business dealings are so confused as to effectively prevent any conclusions as to the client's financial picture. AA's difficulties proved that FOF was pursuing an investment course on certain assumptions without any assurance that the King group governed their conduct by the same assumptions. AA's persistent inability to identify the terms upon which its audit must have been based could not be recognized independently by FOF. In these *sui generis* circumstances, FOF did "base investment decisions on what an audit reveal[ed]". *See Pegasus Fund, Inc. v. Laraneta*, 617 F.2d at 1341. Each audit stated that the financial condition of FOF was fairly stated and internal controls were adequate, based almost entirely on King's records and King's account of the relationship. Thus, the jury reasonably could find the second element of aiding and abetting liability satisfied by AA's actual knowledge or recklessness.

### c. Substantial Assistance

The third element of aiding and abetting liability requires proof that AA associated itself with the fraud or participated in it as something they wished to bring about. *IIT v. Cornfeld*, 619 F.2d at 922, 925 (*quoting United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). AA's activities must have proximately caused FOF's damage; a "but for" causal connection is insufficient to prove substantial assistance. *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d at 484. We have no doubt that AA's failure to disclose the fraud or failure to understand the King-FOF relationship proximately caused FOF's damage. Although it was within FOF's business discretion to enter into the arrangement with King, and it was King's decision to implement his questionable practices, AA had direct responsibility to FOF to determine whether the records presented fairly FOF's financial position and to disclose irregularities which the auditors happened upon. This is not merely an issue of whether the interests were carried on FOF's books at cost, as AA contends, but whether on the basis of the available records the relationships of the contracting parties were consistent with the financial picture presented. Nor does this issue call into question any problem of con-

fidentiality. KRC told AA that the relationship was one thing and AA never bothered to find out the truth by asking its client FOF. In these highly unusual circumstances, AA's failure to disclose the various problems that it discovered pretermitted FOF's discovery of the fraud and lulled FOF into a false sense of security.

## 2. Revaluation

### a. Primary Violation

The evidence of a primary violation of section 10(b) by the King group in the revaluation of FOF's shares is considerable. AA only disputes the fact that King's fraud was "in connection with" the purchase or sale of a security over which we have jurisdiction. That argument is rejected above. See p. 1352 supra. The King group promoted the revaluation and AA and King both played a role in formulating FOF's revaluation policy. These guidelines provided that a partial sale could serve as a basis for a write-up for unrealized appreciation only if the sale was at arm's length and involved a "sufficient percentage" of FOF Prop's holding. King's arrangement of the Mecom and COG purchases of 9% of FOF's interests involved knowing omissions and misstatements of material facts and violated the guidelines he helped to establish. King's motive is transparent. The reliance and causation requirements are amply supported in the record.

■ With respect to the claimed primary violation of section 17(a) by the King group, however, we do not find any basis for finding the King group liable to FOF in the Mecom/COG transaction. See pp. 1351–1352, supra. Section 17(a) only applies to the conduct of offerors or sellers of securities. King was neither an offeror nor seller of securities to FOF in the revaluation transactions. If anything, King was a purchaser from FOF. Accordingly, we grant judgment notwithstanding the verdict for aiding and abetting violations of section 17(a).

### b. AA's Scienter

■ AA knew that the 1969 Arctic revaluation was promoted and arranged by King for FOF. AA had actual knowledge of one fraudulent revaluation of FOF's interests orchestrated by King before the 1969 Arctic revaluation. AA had established its own internal ground rules for approval of the revaluation. The proposed terms of the December 1969 transaction did not satisfy AA's requirements. AA also had actual knowledge of Mecom's inability to undertake the financial burden of the purchase underlying the revaluation. Shortly after it approved the revaluation as being consistent with the guidelines of FOF and committed itself to an unqualified auditor's opinion for IOS Growth, AA learned of another fraudulent revaluation not concerning FOF orchestrated by John King. Thus, AA had actual knowledge of two prior fraudulent revaluations—one directly involving FOF—accomplished in substantially identical fashion (advance of down payment and side agreement covering amounts due thereafter), and every reason to doubt the arm's length nature of the 1969 Arctic proposal. The jury reasonably could find that AA had actual knowledge of King's primary fraud.

■ We also find support for a finding of gross recklessness. AA conspicuously failed to test the arm's length nature of the transactions by asking Mecom whether there were any side deals. Although AA knew that FOF was relying on them to determine whether the revaluations were made in accordance with FOF's guidelines, AA did not inform FOF at any point about either the factual basis for its suspicions regarding the revaluation or its actual knowledge of King's prior fraudulent revaluations. FOF was thus recklessly deprived of crucial information concerning the revaluation which it could not otherwise discover.

### c. Substantial Assistance

■ FOF was relying heavily on AA to develop a methodology to justify the revaluation which King proposed and the FOF

Board found advisable. AA consistently failed to enforce the terms which it regarded as minimally acceptable to recognize unrealized appreciation. AA also failed to disclose to FOF its well-founded doubts about the present sale—so that FOF might independently consider whether the sale met its own AA and King-created guidelines. There is evidence that AA's conduct was a direct and proximate cause of FOF's decision to approve the revaluation.

### Common Law Fraud

The jury found AA liable for common law fraud in regards to both the overcharge and revaluation claims. Recovery for fraud can be based upon a material misrepresentation made with scienter which induces reliance to the detriment of the party to whom the misrepresentation is directed. *E.g., Shores v. Sklar*, 647 F.2d 462, 468 (5th Cir. 1981); *Van Alen v. Dominick & Dominick, Inc.*, 441 F.Supp. 389, 403 (S.D.N.Y.1976), *aff'd*, 560 F.2d 547 (2d Cir. 1977); *Camelot Group, Ltd. v. W. A. Krueger Co.*, 486 F.Supp. 1221, 1228 n.21 (S.D.N.Y.1980). Non-disclosure of material information, or omissions to disclose matter necessary to make other representations not misleading, are also actionable under the common law, provided "there was a fiduciary relationship between the parties" or a duty of disclosure arising from a "relation of trust and confidence" between the parties. *Chiarella v. United States*, 445 U.S. at 228, 100 S.Ct. at 1114; *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 283 (2d Cir. 1975).[21] At a minimum, a claim of fraud

**21.** Defendants typically overstated contention that "[i]t thus appears to be uniformly recognized in all states that an omission cannot form the basis for common law fraud, and that there must be an express misrepresentation of a material fact", based on a slender authoritative reed, is of little assistance in this case. The primary issues are: (1) whether AA's affirmative statements were misrepresentations of fact; (2) whether AA's statements were misleading in omitting to state material information; and (3) whether AA had any duty to disclose information that was withheld, as required to establish a civil fraud claim for non-disclosure.

The charge to the jury concerning omissions and common law fraud was as follows:

> In considering whether or not a false representation of material fact was made by defendants, you should be guided by my earlier instructions to you concerning false statements and materiality under the federal securities laws.
>
> The standards in each instance are the same. Just as in the case of the federal securities laws, liability under the common law may also be based upon non-disclosure of material facts in certain circumstances.
>
> Thus, the requirement of a "misrepresentation" is satisfied where the defendant has failed to disclose facts necessary to keep other statements that it did make from being misleading or where the defendant fails to disclose information despite a relationship of trust and confidence with the plaintiffs.

TR 11,707. The earlier instruction to which the jury is expressly referred states:

> To find defendants liable for failing to tell the plaintiffs certain information, you must find that the information provided to the plaintiffs was misleading in light of the information that was not revealed.
>
> A statement is misleading if it creates a misapprehension of the true state of affairs. The securities laws recognize that a misleading effect may be created by half-truths. A misleading impression may also be created where someone with a duty of disclosure fails to make any disclosure, although it knows information that is within its duty to disclose.

TR 11,688–89. The duties of the parties were also detailed:

> At a minimum, independent auditors verify the addition and subtraction of its client's bookkeeper and examine the accounting procedures and practices and internal financial control mechanisms of its clients.
>
> An independent auditor is supposed to be an outsider, independent of the client's management.
>
> After examining the financial statements prepared by the client, in accordance with generally accepted auditing standards, the auditor expresses an opinion as to whether such financial statements at a particular date and the reported results of particular operations for a particular period have been fairly presented by the client.
>
> An independent auditor has an unqualified duty to its client and to persons that it knows will rely on its statements or reports to state the facts, whether favorable or unfavorable, required to present a full and fair picture of its client's financial conduct.
>
> The investigative procedures necessary to be able to do so vary with the circumstances and the client.
>
> Greater diligence may be required if there is reason to doubt that the transactions between any one or more members of the King

for a failure to disclose may be based on defendant's knowledge that plaintiff was acting under a reasonable, mistaken belief with respect to a material fact. *Id., Jeffrey Resources 1973 Exploration Program v. Monitor Resources Corp.*, 84 F.R.D. 609, 610 (S.D.N.Y.1979); *Green v. Hamilton Intern. Corp.*, 437 F.Supp. 723, 729 (S.D.N.Y.1977). Recklessness satisfies the scienter element of common law fraud. *Transitron Electronic Corp. v. Hughes Aircraft Co.*, 649 F.2d 871, 876 (1st Cir. 1981); *Ainger v. Michigan General Corp.*, 476 F.Supp. 1209, 1227–28 (S.D.N.Y.1979), *aff'd*, 632 F.2d 1025 (2d Cir. 1980); *Morse v. Swank, Inc.*, 459 F.Supp. 660, 667 (S.D.N.Y.1978); *Rousseff v. Dean Witter & Co., Inc.*, 453 F.Supp. 774, 778 (N.D.Ind.1978). A recent Seventh Circuit case described the auditor's common law duty as requiring use of "professional skill to follow up any signs of fraud that he discovers in the audit ... [a]nd if such skill [is] not used, then the audit reports to the client will contain misrepresentations, either negligent or, if the auditor knows that the representations in the reports are untruthful or is indifferent to whether or not they are truthful, fraudulent." *Cenco, Inc. v. Seidman & Seidman*, Nos. 81–2126, 81–2264, slip op. at 6–7 (7th Cir. March 26, 1982). AA had a duty to FOF to review the basic agreements underlying FOF's business operations with the King group, a duty to state publicly whether the financial statements prepared by FOF fairly presented FOF's financial position, a duty to disclose inadequacies in FOF's internal accounting procedures, and a duty to disclose fraud that it happened upon. Moreover, AA knew that FOF would rely on its opinion at least as the opinion reflects the above listed duties.

■ The common law fraud claim concerning the overcharges is based upon AA's misleading clean opinions on the year end 1968 and mid-year 1969 FOF and FOF Prop audits and upon AA's failure to disclose conflicting pricing expectations in the relationship between KRC, TCC and FOF. It was during the FOF year end 1968 audit that AA first became aware of the magnitude of the markups being charged by King on sales to FOF. AA's failure to clarify the parties' differing conceptions of the relationship and pricing arrangement materially affected the fair presentation of FOF's financial condition. To uphold the jury verdict it is not necessary to determine conclusively whether the December 31, 1968 and June 30, 1969 auditor's opinions were false or merely misleading for failure to reflect or resolve the patent ambiguities in the relationship between the King entities and FOF. It may reasonably be found on the evidence that the clean opinions were materially misleading. Alternatively, the jury reasonably could find that AA failed to disclose FOF's inadequate accounting safeguards despite a duty to do so. As we previously determined that AA had actual knowledge of King's primary fraud concerning the overcharges, AA may also be found to have failed to disclose such acts to FOF despite a professional duty and an express contractual obligation to do so. The jury verdict that AA was primarily liable for securities violations in connection with the revaluation rested on AA's special duties. The same duties and acts suffice to prove AA's misrepresentations or omissions for common law fraud.

■ AA misses the mark in arguing that scienter was not proven because of the absence of an organized market pricing mechanism (like the Stock Exchange) for natural resource interests, the potential for rapid fluctuations in prices of oil and gas interests, and the prevalence of high markups in the industry. FOF was not a knowledgeable industry purchaser participating

---

Group and plaintiffs were being honestly conducted or if the problems confronted are unique.
An auditor may have a duty to correct any misstatements, omissions or deceptive practices that they discover, especially where they knew or should have known that the

client or its shareholders will rely on the auditor's determination.
TR 11,703–04. *United States v. Amrep Corp.*, 560 F.2d 539, 543 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978).

as an equal in the rough-and-tumble world of oil and gas speculation. Rather, FOF was a passive investor willing to pay going rates for assets with the protection of either the most favored nation clause (as described at p. 1355, *supra*) or an obligation of fair dealing and honesty on the part of the vendor of natural resource interests. An understanding of the agreement between King and FOF and not the general industry practices was central to AA's analysis of FOF's financial posture. It is in this area that AA failed to fulfill its obligations and not with respect to its knowledge of industry practices or King's perception of the agreement. There is evidence, analyzed above, which reasonably supports a finding of AA's actual knowledge or recklessness which satisfies the scienter requirement as to both the overcharge claims and the revaluation claims.

It is readily apparent that FOF would rely on AA to properly perform its duties as outlined above. Nonetheless, AA argues with respect to the overcharge claim that FOF had no right to know King's cost figures and AA had no right to reveal such confidential information, so FOF could not have relied upon AA's failure to reveal King's costs. AA's invocation of the shield of client confidentiality conveniently disregards the fact that KRC's and TCC's records were used for the NRFA audits and that on numerous occasions AA sought information about the KRC/FOF relationship from the King group. Assuming that the duty of confidentiality applies in this instance, when an auditor finds its independence in question, or a conflict of interest developing, there was testimony that it may: (1) strongly encourage one client to make the necessary disclosure; (2) disclose that it has relevant information not available to the other client; or (3) resign from one account. AA did none of these. Moreover, it is not clear that AA fully recognized the delicate position it was in, only because it recklessly failed to resolve the uncertainties surrounding the King/FOF business relationship. The jury reasonably could find that FOF continued to purchase natural resource interests at King's asking price

and performed the revaluation in reliance upon AA's misrepresentations or omissions.

AA argues more strenuously that FOF's reliance was unjustifiable. If the material information that it was AA's duty to disclose was peculiarly within AA's knowledge or FOF had no independent means of ascertaining the truth, the Board of Directors of FOF may justifiably rely on AA without investigation. *Mallis v. Bankers Trust Co.*, 615 F.2d at 80. If the material information that it was AA's duty to disclose was available to FOF or FOF was placed on guard (or "practically faced with the facts") so that failure to investigate constituted recklessness or worse, FOF's reliance was unjustifiable. *Id.* at 80–81. *See generally Dupuy v. Dupuy*, 551 F.2d 1005, 1013–24 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). FOF's Board of Directors and top management may not have done all that they should either in deciding to enter an investment relationship with King or in scrutinizing certain aspects of their ongoing relationship. However, FOF's lapses in certain areas do not excuse AA's failure to perform its duties in other areas which a director reasonably can rely on an auditor to do. With respect to the overcharge claims, it was AA's duty to review the arrangement underlying FOF's numerous purchases from KRC and TCC, whether such agreements were written or oral. AA could not assume that FOF's understanding of the agreement was the same as King's. The FOF Board of Directors was not required to guess that AA had been unable to identify the key terms of the KRC/TCC–FOF relationship except by asking the King group for clarification, nor could it guess that the answer received would be materially different from the conception of the Board or the available documents. The FOF Board justifiably relied upon AA's reputation and standard audit practices to review such arrangements. Qualification of financials or reported internal accounting deficiencies would put the Board on notice that some investigation was required. Less formal queries might also constitute notice. But in this case no

notice was received by the Board. Publicly available information might also put FOF on notice that further inquiry was required. Contrary to AA's assertion, there is nothing in the KRC Annual Reports which would "obviously" put FOF on notice of the profits being made on sales to FOF by KRC and TCC. Px–585; Px–586. AA knew KRC's and TCC's costs and the prices being charged to FOF and to other customers of KRC or TCC. FOF only knew the prices it paid. There is conflicting evidence whether the cost of the Canadian permits to KRC was publicly available. Nevertheless, the information which was not disclosed regarding the alleged overcharges was within AA's knowledge, not readily ascertainable by FOF, and within AA's duty to disclose. The argument that FOF's reliance upon AA was unjustifiable is equally weak in the case of the revaluations, where AA played an active role in developing the guidelines for approval of a revaluation based upon unrealized appreciation established by a partial sale. The deal would not have been consummated without AA's express commitment not to qualify the IOS Growth year end 1969 report. AA's representation reflected the conclusion that the partial sale proposed by King would satisfy FOF requirements, when AA knew or recklessly failed to discover that the partial sale would not qualify under even the broad standard formally adopted by FOF. Yet AA knew about Fox-Raff, Blakely-Wolcott, the precarious financial condition of Mecom, and the loan arrangement by King for COG. FOF did not know any of this information and could not have discovered it independently of AA. The addition of the words "subject to" in the 1969 FOF Annual Report was neither soon enough nor complete enough to avoid substantial damage to FOF. The jury reasonably concluded that FOF's reliance was not unjustifiable regarding both the overcharge and revaluation claims.

*Breach of Contract*

*1. Applicable Law*

AA argues that Swiss law is applicable to the breach of contract claim because the engagement letters of December 11, 1968 and December 4, 1969 were sent over the signature of Arthur Andersen & Co. on Zurich letterhead to IOS, Ltd. in Zurich. The mechanical application of the law of the place of making of a contract has been discarded by New York. *International Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 582 (1969); *Hormel Intern. Corp. v. Arthur Andersen & Co.*, 55 App. Div.2d 305, 306, 390 N.Y.S.2d 457, 458 (2d Dept. 1977). It is thus significant that the 1968 letter identifies the New York office as bearing responsibility for the FOF Prop report and the 1969 letter notes that AA's New York office will prepare the FOF Prop and IOS Growth opinions. It is not necessary to repeat the substantial role played by AA partners in Denver and Chicago, as well as New York. We believe that New York law could apply to this case.[22] Moreover, even if Swiss law might apply, the law of the forum may be applied unless foreign law is litigated by the parties. *Vishipco Line v. Chase Manhattan Bank, N. A.*, 660 F.2d 854, 860 (2d Cir. 1981). The complaint pleaded a contract claim in the alternative under the law of New York, Switzerland or France. Neither party attempted to prove the law of a foreign forum in the course of the trial or raised the issue in requests to charge. We thus do not have to apply Swiss law and do not reach the sharply contested issue whether third-party beneficiaries are barred from suit on a contract in Switzerland.

*2. Statute of Limitations*

AA contends that the breach of contract claims are essentially malpractice claims and that the three-year tort statute of limitations applies rather than the six-year pro-

---

22. We need not decide whether New York or Colorado law applies to the breach of contract claim. AA only contends that Swiss law applies and, if Swiss law does not apply, New York law applies to bar the breach of contract claim. There is no contention that Colorado law is applicable or that Colorado law is materially different from New York law.

vision for contracts. As this suit was commenced on February 4, 1975 and the letters of engagement were dated December 11, 1968 and December 4, 1969 (although the latest activities at issue herein occurred in mid-1970), AA argues that the breach of contract claims are time-barred. We denied summary judgment on this issue, stating that FOF is "entitled to attempt to prove at trial that [AA] breached its contractual duties to [FOF]".

New York courts, emphasizing that the reality of the action or the remedy sought and not its form or theory of liability must determine the applicable statute of limitations, *e.g., Sears Roebuck & Co. v. Enco Assocs., Inc.,* 43 N.Y.2d 389, 394–95, 401 N.Y.S.2d 767, 770, 372 N.E.2d 555, 557 (1977); *In re Paver & Wildfoerster,* 38 N.Y.2d 669, 674–75, 382 N.Y.S.2d 22, 24–25, 345 N.E.2d 565, 568 (1976), have not settled upon a single time period as applicable to professional malpractice. The Court of Appeals has ruled that "claims by owners against architects arising out of the performance or nonperformance of obligations under contracts between them are governed by the six-year contract Statute of Limitations". *Sears Roebuck & Co. v. Enco Assocs., Inc.,* 43 N.Y.2d at 395, 401 N.Y.S.2d at 770, 372 N.E.2d at 558. The broad rationale for the decision is not limited strictly to owner-architect squabbles:

> All obligations of the architects here, whether verbalized as in tort for professional malpractice or as in contract for nonperformance of particular provisions of the contract, arose out of the contractual relationship of the parties—i.e., absent the contract between them, no services would have been performed and thus there would have been no claims. It should make no difference then how the asserted liability is classified or described, or whether it is said that, although not expressed, an agreement to exercise due care in the performance of the agreed services is to be implied; it suffices that all liability alleged in this complaint had its genesis in the contractual relationship of the parties.

*Id.* at 396, 401 N.Y.S.2d at 770–71, 372 N.E.2d at 558. *Cf. Brick v. Cohn-Hall-Marx Co.,* 276 N.Y. 259, 263–264, 11 N.E.2d 902; *see* Prosser, Torts § 92, p. 613 (4th ed. 1971). However, the *Sears* court expressly denied any intent "to disturb the holdings in the line of cases that deal with claims for *personal injuries* for malpractice on the part of members of one of the professions" citing N.Y. CPLR § 214(6) (McKinney) (1972). 43 N.Y.2d at 395, 401 N.Y.S.2d at 770, 372 N.E.2d at 558 (emphasis added); *see also In re Paver & Wildfoerster,* 38 N.Y.2d at 675, 382 N.Y.S.2d at 25, 345 N.E.2d at 568. In a case decided less than a year before *Sears,* the Court of Appeals applied the six-year period to a claim of breach of loyalty under an employment contract, distinguishing cases "involving causes of action which stem from the breach of a defendant's duty to use due care", which are governed by the three-year statute of limitations for negligence. *Western Electric Co. v. Brenner,* 41 N.Y.2d 291, 294, 392 N.Y.S.2d 409, 411, 360 N.E.2d 1091, 1094 (1977); *accord, Union Bank v. HS Equities, Inc.,* 423 F.Supp. 927, 929 (S.D.N.Y.1976); *Hartford Fire Ins. Co. v. Callanan Marine Corp.,* 389 F.Supp. 436, 439 (S.D.N.Y.1973). One of the two cases distinguished by the *Western Electric* court was *Carr v. Lipshie,* 8 App.Div.2d 330, 187 N.Y.S.2d 564 (1st Dept. 1959), *aff'd,* 9 N.Y.2d 983, 218 N.Y.S.2d 62 (1961). *Carr* held that an action against accountants for failure to properly perform its audit services must be brought within the three-year period "where the contracting party either expressly or impliedly promises to perform services of the standard generally followed in the profession or promises to use due care in the performance of the services to be rendered", although in dicta it stated that the six-year period might apply "where a specific result is guaranteed by the terms of the agreement". *Id.* 8 App.Div. at 332, 187 N.Y.S.2d at 566–67, *aff'd,* 9 N.Y.2d 983, 218 N.Y.S.2d 62. *In re Investors Funding Corp.,* [1980 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 97,696, at 98,659–60 (S.D.N.Y. 1980), applied the *Carr* holding to an accountant's alleged liability for breach of

contract in performing accounting services. Judge Connor declined to find that *Sears* altered the rule of *Carr.* The most recent New York State case concerning malpractice limitations also applies *Carr* and distinguishes *Sears. Adler & Topal, P. C. v. Exclusive Envelope Corp.,* 84 App.Div.2d 365, 367–68, 446 N.Y.S.2d 337, 338–39 (2d Dept. 1982), dismissed two counterclaims against accountants for failure to exercise ordinary care and breach of an oral contract by failing to exercise the ordinary care required of accountants based upon the three-year limitations period. The informal, oral agreement in *Adler & Topal* was contrasted with the detailed, written agreement in *Sears.* Once again, however, the broad language of Justice Thompson is not limited to the facts of *Adler & Topal* :

> It is difficult to conceive of any situation in which an accountant would render services to a client without some sort of bare bones agreement, explicit or implicit. The potential client must request the accountant to perform certain tasks or must agree to let the accountant do them if the accountant solicits him as a customer. But surely such a simple contract cannot convert all ordinary malpractice actions into contract claims. Such a holding would practically read the specific malpractice provisions out of CPLR 214, thus making the statutory provisions surplusage. It would be inappropriate to permit simple malpractice claims, which have their true genesis in negligence, to be converted to contract claims on the basis of such a simple "contractual" relationship.

84 App.Div.2d at 367, 446 N.Y.S.2d at 339.

The engagement letters are somewhat more formal and detailed than the oral agreement in *Adler & Topal,* but significantly less precise in describing AA's duties and the specific uses to which the audit information would be put than the architect's contract in *Sears.* The engagement letters generally require the exercise of ordinary care consistent with GAAS and GAAP, but do contain a specific representation that any irregularities that were discovered by AA would be revealed to FOF. Obviously, too, the suit concerns only one of pecuniary loss and not personal injury. On balance, we find that AA's specific undertaking to reveal irregularities is actionable as a contractual duty separate and independent from the obligation to use due professional care in its audits. *White v. Guarente,* 43 N.Y.2d 356, 362–63, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315 (1977), describes an accountant's assumption of the task of auditing and preparing tax returns as imposing a duty "arising out of contract or otherwise, to act with care if he acts at all". FOF's breach of contract claim is not solely concerned with violation of GAAS and GAAP or the objective test of reasonableness. AA's failure to disclose to FOF any irregularities actually discovered in the course of its audit is a breach of a specific, material term of the engagement letter.[23] We find *Western Electric* instructive—although a duty of loyalty is ordinarily owed to employers by employees whether or not an employment contract is made, the Court of Appeals applied a six-year limitations period in light of the express employment contract. AA may have had a general duty to watch out for fraud, and to exercise its professional judgment in deciding how to deal with fraud if it was discovered, but the engagement letter specifically obligates AA to disclose to FOF any irregularities that it discovers. As we previously held that a jury reasonably could find that AA actually knew of King's fraud concerning the overcharges and the December 1968 Arctic revaluation, but did not disclose the information to FOF, the question of a breach of the express agreement to disclose irregularities was properly before the jury.[24]

---

**23.** This construction of the letter of engagement reflects AA's understanding of the breach of contract claim, as set out in Defendant's Requests to Charge Nos. 71 74, filed July 23, 1981. It was also reflected in AA's discussion of the breach of contract claim at TR 11,054–55.

**24.** Additionally, the jury reasonably could find that AA undertook special contractual duties guaranteeing a specific result in connection

*Jury Instructions*

AA asserts numerous errors in the charge to the jury. Several of AA's claimed legal errors in the charge have been discussed above in relation to the adequacy of proof concerning the substantive claims.[25] The decision not to require the jury to determine the relative fault of various non-parties is amply discussed in our prior Memorandum Decision of December 15, 1981 and at pp. 1381–1382 *infra*. Several other contentions are frivolous and citation to the records is sufficient discussion.[26] The remaining rulings are discussed

with the revaluation. This claim was stated in the summary of the parties' contentions (TR 11,678), although the jury instructions regarding breach of contract referred primarily to the contract of engagement (TR 11,710). It was abundantly clear, however, that in a series of communications culminating in March's December 23, 1969 telex to FOF (Px–190), AA agreed to determine whether the revaluation was made in accordance with FOF's guidelines. A failure to properly perform such an express representation may constitute a breach of contract claim as to which a six-year limitations period attached.

**25.** We do not need to reconsider at this point the questions of: causation (AA Brief at 424); applicability of section 17 (*id.* at 444); aiding and abetting under section 17 (*id.* at 445); scienter under section 17 (*id.* at 446); recklessness and aider and abettor liability (*id.* at 436); reliance (*id.* at 439, 440); materiality (*id.* at 442); applicability of Rule 10b 5(2) (*id.* at 439); deceptive practices (*id.* at 440); and elements of common law fraud (*id.* at 447).

**26.** AA singles out one sentence out of several sentences and argues that it should have been repeated in connection with our recitation of the elements of a primary fraud at TR 11,699 700. In providing a checklist reminder to the jury of the elements of primary fraud, we were not required to repeat any or all of the substantive charge on primary fraud. The reminder is quite obviously a reference to TR 11,690 92, about which AA does not complain.

Even more frivolous is AA's contention that we failed to instruct that the false representations necessary to prove common law fraud must have been made by AA. We began the discussion of common law fraud with the overview: "Plaintiff's claim that the *defendant's conduct* amounts to common law fraud with respect to both the overcharge claims and the revaluation claims". TR 11,705 (emphasis added). We thereafter listed the elements of proof required to sustain this claim: "First a representation of a material fact. Two, the falsity of that representation. [N.B.: AA's selective quotation ends here] Three, that *defendants acted* with scienter. Four, that the plaintiffs relied upon the misrepresentation, and five, that the plaintiffs suffered damages as a result of their reliance". TR 11,706 (emphasis added). There follows immediately an elaboration of the five elements, beginning "[i]n considering whether

or not a false representation of a material fact was made *by defendants . . .*". TR 11,707 (emphasis added). Quotation of another explicit reference to AA's conduct at TR 11,707 is unnecessary to dispose of this baseless claim.

It is also unnecessary to consider at length AA's contention that inclusion of section 17(a)(2) in the charge permitted the jury to conclude that AA could be found liable for violating section 17(a)(2) merely because it charged a fee for its services. AA Brief at 445. The charge explicitly repudiated any such theory. The jury was instructed that AA could not be found liable as a primary violator of section 17(a)(2). TR 11,685–86.

AA's contention that we conveyed the prejudicial and erroneous impression to the jury that John Orr, FOF's liquidator, possessed different rights from FOF is similarly without merit. To identify the parties who had been referred to throughout the trial, we instructed the jury as follows:

> Plaintiffs are the Fund of Funds, Ltd.—we call them FOF—FOF Propriety Funds, Ltd., sometimes referred to as FOF Prop or Prop, and IOS Growth Fund, Ltd., also known as Transglobal Growth Fund, Ltd. All of the plaintiffs are Canadian corporations.
> The Fund of Funds, which, as I said, I may refer to as FOF, and IOS Growth Fund, are open-ended mutual funds.
> FOF Proprietary Funds is a wholly owned subsidiary of FOF.
> John Orr is the permanent liquidator of FOF and IOS Growth Fund, and he also controls FOF Proprietary Funds in that capacity.
> He was appointed permanent liquidator of these companies by the Supreme Court of the Province of Ontario, Canada, on August 1, 1973. As permanent liquidator, he stands in the place of these entities and the shareholders for the purpose of protecting their interests. I shall refer to the entities under the control of John Orr, collectively, as the plaintiffs throughout this charge.
> Defendants in this case are Arthur Andersen & Co., Arthur Andersen & Co. (Switzerland). I shall refer throughout this charge to these parties collectively as the defendants. The defendants are engaged in practicing the profession of accounting and auditing.

TR 11,660 -61.
The charge expressly states that Orr represents "*these entities and the shareholders*." TR 11,-661 (emphasis added). It was emphasized that

below. Where possible, we will discuss the separately stated errors under a common heading.

## 1. AA's Duty

■■■ AA contends that the charge "failed adequately to instruct the jury" concerning AA's duty to disclose information to FOF. Specifically, AA argues that the charge did not provide guidance as to any special relationship between accountants and clients necessary to trigger a duty to disclose. Given the extensive reliance by counsel for both parties on accounting industry standards and tasks, the duties of the parties were set out in a special section of the instructions, so that they would not be lost in the discussion of the elements of securities actions. The instruction described the auditor's role, as distinct from the responsibilities of FOF's financial officers:

> At a minimum, independent auditors verify the addition and subtraction of its client's bookkeeper and examine the accounting procedures and practices and internal financial control mechanisms of its clients.
>
> An independent auditor is supposed to be an outsider, independent of the client's management.
>
> After examining the financial statements prepared by the client, in accordance with generally accepted auditing standards, the auditor expresses an opinion as to whether such financial statements at a particular date and the reported results of particular operations for a particular period have been fairly presented by the client.

TR 11,703–04. This largely incorporated AA's Request # 40. The charge further elucidated AA's baseline responsibility "to present a full and fair picture of its client's

financial conduct" and the different degrees of, responsibility depending upon an accountant's intent and the problems posed by the engagement, particularly relevant to the aiding and abetting claim. *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 575. *Edwards & Hanly v. Wells Fargo Securities Corp.*, 602 F.2d at 485; AA's Requests # # 45–46. The instructions also stated the significance of evidence concerning GAAS and GAAP. The jury was told that the consensual, self-regulating accounting standards were not a substitute for the substantive standards under the securities laws. AA would have us charge that compliance with industry standards was "highly persuasive", based upon the language and not the holding in *United States v. Simon*, 425. F.2d 796, 806 (2d Cir. 1969). Our charge gave the jury leeway to resolve the factual dispute whether (and what) procedures and standards were violated, without favoring one side or the other. The charge adequately and completely explained both the accountant's ordinary role and the extraordinary circumstances which might give rise to a higher standard of conduct. The jury was instructed to apply these concepts in assessing AA's duties, as the introductory sentence to the accountant's duties passage states, "I have alluded at different points in the charge to the duties of the parties". TR 11,703. The closing sentence of this section also instructs the jury to apply the duties charge in connection with the elements section.

## 2. Value of the Assets

AA argues that it was error not to instruct the jury that high markups are not illegal, contending that "there can be no such thing as an 'overcharge' ". AA's Brief at 419. AA also claims that it was a *non sequitur* to instruct the jury as to the meas-

---

"the entities under the control of John Orr" would be referred to as "plaintiffs" in the body of the charge. *Id.* There was never any issue in the case as to Orr, his rights or responsibilities under Canadian law, or as to the shareholders. AA's counsel conceded that the sentence now challenged did not contain any inference that acts and decisions of FOF in 1968 70 were not attributable to FOF because Orr now

represents the company. TR 11,318. In closing arguments, moreover, AA's counsel specifically raised the issue that the FOF Board was in control at the time of the transactions at issue, and not Orr, and that FOF was accountable for its acts. TR 11,293. This aspect of the case was taken up by the charge concerning justifiable reliance. TR 11,694 96.

ure of damages that: "You should fix the fair value of these interests at the time plaintiffs purchased these interests if the information that was misrepresented or not disclosed were known." TR 11,712. This claimed error concerns only the overcharge issue.

The first contention is frivolous. FOF's most favored nation status was a limitation on the prices KRC and TCC could charge for natural resource interests. Violation of the most favored nation agreement by charging prices that are too high is illegal.

We adopted the "out-of-pocket" measure of damages, "the usual compensatory method of calculating damages in securities fraud cases", in our Memorandum Decision of June 8, 1981. As the nature of the overcharge claim involves the significance of allegedly undisclosed material information at the time of FOF's purchase, the measure of damages is as stated in the charge. There are various factors which might affect the value of a speculative asset without a readily available market value. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972). In light of the extensive discussion of this issue by counsel, it was not appropriate to marshal the possible alternatives that might affect the value of natural resource assets.

We do not believe that the instruction endorsed or gave heightened importance to some factor at the expense of others. To avoid any prejudice to FOF resulting from a juror's broad, albeit unwarranted, understanding of our charge to disregard King's cost in determining AA's liability, a curative instruction was required.

### 3. Duties of the King Group

AA contends that the jury instructions "failed to give adequate guidance for determining whether King and the King Group might have had any special duties", AA Brief at 416, and that breach of the duties enumerated in the charge does not amount to a securities law violation. *Id.* at

444. The instructions expressly confine consideration of any special duties to the issue of King's primary fraud as an element of the aiding and abetting claim. The Supreme Court has upheld the application of section 10(b) to cases of non-disclosure, "[b]ut such liability is premised upon a duty to disclose arising from a *relationship of trust and confidence between parties to a transaction*". *Chiarella v. United States*, 445 U.S. 222, 230, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980) (emphasis added). The charge adequately instructs the jury that by "agreement or understanding or by a course of conduct" the King group may have entered into a special relationship with FOF and FOF may have placed special "trust and reliance" on King. TR 11,700.

AA also claims error in our failure to charge the substance of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 *et seq.* (1976) ("IAA"). To establish primary fraud, however, it is not necessary that KRC or TCC be found to have been investment advisors within the meaning of the IAA. King had near total discretion to invest in natural resource interests for FOF. Such a relationship of trust and reliance imposes a duty of fair dealing on the advisor or manager of a discretionary investment account. Non-disclosure of material information despite a duty to disclose which directly affects the purchase or sale of securities between the parties is actionable whether or not the formal requisites of the IAA are met, because each element of a securities claim is established. The charge is so limited and it is valid.

### 4. Due Diligence

AA does not challenge the accuracy of the court's charge concerning unjustifiable reliance, but contends that the jury "should have been instructed to consider the fact that these plaintiffs were highly sophisticated businessmen", AA Brief at 427. AA would have us include in the charge the often flowery language of *Hirsch v. DuPont*, 553 F.2d 750, 763 (2d Cir. 1977) and 2 Kent, Commentaries 485, *quoted in Edwards & Hanly v. Wells Fargo Securities*

*Clearance Corp.*, 602 F.2d at 489. It is asserted by AA that this language is necessary to prevent the jury from punishing AA for the directors' "careless indifference to facts readily available". AA Brief at 427.

■■■ In this circuit, "plaintiff's burden is simply to negate recklessness when the defendant puts that in issue, not to establish due care". *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 79 (2d Cir. 1980). The *Mallis* court essentially adopted the standard of a plaintiff's conduct as thoroughly analyzed by Judge Wisdom in *Dupuy v. Dupuy*, 551 F.2d 1005, 1013–20 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). *Mallis v. Bankers Trust Co.*, 615 F.2d at 78–79 & n.10. Judge Wisdom concluded:

> Both tort law and federal securities policy support imposing on the plaintiff only a standard of care not exceeding that imposed on the defendant. Although the "scienter" requirement may still be unsettled, the Supreme Court has imposed on defendants a standard not stricter than recklessness. In this case, then, the question should not be whether [plaintiff] acted unreasonably by failing to investigate the condition of Lori Corporation. Instead, the Court should ask whether plaintiff intentionally refused to investigate in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. W. Prosser, § 34 at 185 (1971).

*Id., see also Shores v. Sklar*, 647 F.2d 462, 470 n.6 (5th Cir. 1981) (en banc), *petition for cert. filed*, 50 U.S.L.W. 3377 (U.S. November 2, 1981) (No. 81–839). It is consistent with this test to charge also that it must have been possible for plaintiff to discover the allegedly withheld information before reliance is considered unjustifiable. *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 409 (3d Cir. 1973). The charge covered all this ground. Thus, the jury had before it the very question that AA seeks to have answered: whether the information which AA did not reveal to FOF was readily available to FOF. To dictate to the jury that the FOF directors were sophisticated businessmen gives sanction to an argument of counsel. The court need not include in the charge additional editorial matter which might intrude upon the jury's province as factfinders and judges of the credibility of witnesses.

### 5. Determining Common Law

■ AA objects to our instructions concerning common law damages. AA did not propose any instructions concerning damages. In our day long discussion of the first draft charge, however, AA raised the issue of breach of contract damages. TR 11,053–55. The thrust of AA's concern was the foreseeability of damages to FOF for breach of contract. The sufficiency of the general language of the charge on common law damages was never in issue. Nor was any such issue raised following the charge and prior to the commencement of jury deliberations. Accordingly, AA's objection is waived. Fed.R.Civ.P. 51. *Compagnie Nationale Air France v. Port of N. Y. Authority*, 427 F.2d 951, 955 n.2 (2d Cir. 1970). *See Hudson v. Smith*, 618 F.2d 642, 646 (10th Cir. 1980).

■ Even were we to reach the merits of AA's objection, we find the charge adequate and accurate. The charge cautions that damages are recoverable only insofar as they are "the natural and probable consequences of the acts that give rise to liability [and] justly and fairly compensate[ ] for the injuries suffered, [but that any award should not] punish the defendants for any fault or wrongdoing [or] enrich the plaintiffs". TR 11,711–12. *See* Federal Pattern Jury Instructions §§ 85.08, .10 (3d ed. 1977). In the specific context of common law contract and fraud damages, the instructions restate the principle of foreseeability. TR 11,713–14. The parties' contentions with respect to common law damages were stated, without objection, earlier in the charge. TR 11,673–80. *See generally Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977).

### 6. Burden of Proof

AA challenges the application of the preponderance of the evidence standard rather than the clear and convincing evidence standard in relation to section 10(b) and Rule 10b–5.

Plaintiffs traditionally bear a greater burden of proof in civil fraud cases than in ordinary civil damage actions. *Huddleston v. Herman & MacLean*, 640 F.2d at 545–46, *cert. granted,* —— U.S. ——, 102 S.Ct. 1766, 72 L.Ed.2d 173; *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 1807, 60 L.Ed.2d 323 (1979) (dicta); *Woodby v. INS,* 385 U.S. 276, 285 & n.18, 87 S.Ct. 483, 487 & n.18, 17 L.Ed.2d 362 (1966) (dicta). Indeed, cases have expressly required "clear and convincing proof" of common law fraud claims under New York law, *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 79 (2d Cir. 1980); *Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.,* 569 F.2d 181, 186 (2d Cir. 1977), and under Illinois law, *Merit Ins. Co. v. Colao,* 603 F.2d 654, 658 (7th Cir. 1979). However, this principle does not necessarily apply to securities fraud actions. The Supreme Court upheld the application of a preponderance standard in an SEC disciplinary proceeding for fraud under the Investment Company Act of 1940 and the Investment Advisers Act of 1940. *Steadman v. SEC,* 450 U.S. 91, 98–99, 101 S.Ct. 999, 1006, 67 L.Ed.2d 69 (1981). The holding was not based upon a consideration of the seriousness of the sanctions or the indirect nature of proof, which factors justify a higher standard in common law fraud actions, but upon the Administrative Procedure Act. *Id.* The *Steadman* Court thus did not decide upon a single standard applicable to all securities fraud actions. However, in at least three recent civil securities fraud cases, courts have applied a preponderance standard. *Franklin Life Ins. Co. v. Commonwealth Edison Co.,* 451 F.Supp. 602, 607 (S.D.Ill.1978), *aff'd,* 598 F.2d 1109 (7th Cir.) (per curiam), *cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979); *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 79 (2d Cir. 1980) (dicta); *Scarfarotti v. Bache & Co., Inc.,* 438 F.Supp. 199, 201 (S.D.N.Y.1977).[27] Nonetheless, the Fifth Circuit held, even after *Steadman,* that the "clear and convincing" standard applied to 10b–5 suits. *Huddleston v. Herman & MacLean,* 640 F.2d at 546, *cert. granted,* —— U.S. ——, 102 S.Ct. 1766, 72 L.Ed.2d 173. Another decision also recognized the "strong argument" for applying a clear and convincing standard of proof in 10b–5 actions. *Kass v. Hornblower & Weeks-Hemphill Noyes,* [1974–75 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94, 721 at 96,383. Although the issue is not free from doubt, we are guided by *Mallis* and *Steadman* to apply the preponderance standard.

### 7. Payments to Witnesses

AA contends that the instructions respecting the credibility of witnesses were inadequate for failure to highlight allegedly improper payments to witnesses Dickieson and Rallo. As a substantive matter, we are not convinced that the mere fact of payments, even seemingly large payments, warrants any explicit reference to 18 U.S.C. § 201.[28] Moreover, there is no evidence

---

**27.** Complicating the picture still more is the fact that churning claims, which arise under sections 17(a) and 10(b) but do not require *scienter,* have long applied a preponderance standard. *E.g., Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 494 F.2d 168, 171 n.2 (10th Cir. 1974); *Fey v. Walston & Co., Inc.,* 493 F.2d 1036, 1049 (7th Cir. 1974); *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202, 1209 (9th Cir. 1970).

**28.** Section 201 provides, in pertinent part:
(d) Whoever, directly or indirectly, corruptly gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court . . .
(e) Whoever, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any other person or entity in return for being influenced in his testimony under oath or affirmation as a witness upon any such trial, hearing, or other proceeding . . .
Shall be fined not more than $20,000 or three times the monetary equivalent of the thing of

suggesting an intent to influence the witnesses testimony. *See United States v. Isaacs*, 347 F.Supp. 763, 767 (N.D.Ill.1972).

 However, it is permissible, indeed desirable, to bring any such payments to the attention of the jury and for counsel to comment upon the possible effect of large payments upon a witness' credibility. *See United States v. Barrett*, 505 F.2d 1091, 1101 (7th Cir. 1974). AA's counsel did make such arguments to the jury concerning Dickieson and Rallo. *E.g.*, TR 1137–38 (summation re: Dickieson); TR 1138–39 (summation re: Rallo). The jury was instructed "to carefully scrutinize ... the circumstances under which each witness has testified and every matter in evidence which tends to show whether a witness is worthy of belief", TR 11,667, including "any relationship any witness may bear to any side of the case ... [and] the favoritism or prejudice of a witness", TR 11,668. Thus, the issue of witness payments was fully put before the jury and the charge concerning credibility permitted and encouraged the jury to use any such factors in evaluating a given witness' testimony.

### 8. Identity of Plaintiff

 AA raises two related objections concerning the identity of the plaintiff: (1) NRC was the purchaser of the natural resource interests and not FOF, and (2) FOF therefore violated the rule against barratry, champerty and maintenance. It is not disputed that NRC was the named purchaser of most of the natural resource interests.[29] It is also undisputed that NRC was a shell corporation through which NRFA monies freely flowed from FOF for the purchases in question. FOF, and not NRC, established and maintained the ongoing relationship with John King. FOF, and not NRC, reviewed whatever information was provided by King regarding the oil, gas or mineral interests. Insofar as AA contends that these purchases were a joint venture and cites the means of latent investor control available to the partner claiming fraud as avoiding the securities laws, it can only refer to FOF. Although NRC was named in Nominee Agreements, only FOF allegedly had the means available to value or exercise discretion as to various interests. In our Memorandum Decision of December 15, 1981, we noted several other facets of the

value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States....

. . . .

(h) Whoever, directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court . . .

(i) Whoever, directly or indirectly, asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of the testimony under oath or affirmation given or to be given by him as a witness upon any such trial, hearing, or other proceeding, or for or because of his absence therefrom—

Shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

(j) Subsections (d), (e), and (i) shall not be construed to prohibit the payment or receipt of witness fees provided by law, or the payment, by the party upon whose behalf a witness is called and receipt by a witness, of the

reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding, or in the case of expert witnesses, involving a technical or professional opinion, a reasonable fee for the time spent in the preparation of such opinion, and in appearing and testifying.

*Hamilton v. General Motors Corporation*, 490 F.2d 223 (7th Cir. 1973), where the court affirmed the dismissal of an implied contract claim by the estate of a non-expert witness seeking compensation for services relating to litigation involving General Motors, is instructive as to the strong public policy against payments to fact witnesses. *Id.* at 227–28. There is nevertheless a great difference between questionable payments to witnesses and subornation of perjury. Defendant's citation in support of vacating the judgment for improper payment concerns evident perjury, not potentially questionable payments. *Peacock Records, Inc. v. Checker Records, Inc.*, 365 F.2d 145, 147 (7th Cir. 1966), *cert. denied*, 385 U.S. 1003, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967).

**29.** FOF and not NRC was the purchaser of the CSADC and Port Gentil interests.

NRC–FOF relationship that compel us to treat them as the same for purposes of this case "if the context permits":

> NRC's assignment of rights to plaintiffs . . . and NRC's ratification of the present action under Rule 17(a) give NRC a stake in the outcome of this suit. We also note the substantial, if not complete, overlap between plaintiffs' shareholders who will be entitled to share in any recovery, and the shareholders who benefit from any recovery by NRC. . . . [Moreover], NRC's interest did not extend to the daily management of the mutual fund and, thus, NRC has no claim arising out of the revaluation.

 The foregoing undercuts AA's claim that the agreement between NRC (now a subsidiary of Global) and FOF was champertous. As NRC and FOF both had legitimate, disputed claims against AA arising out of substantially the same events, the settlement of their differences by an agreement to proceed through FOF is not champertous. *See Poloron Products, Inv. v. Lybrand Ross Bros. & Montgomery,* 534 F.2d 1012, 1015–16 (2d Cir. 1976); *Coopers & Lybrand v. Levitt,* 52 App.Div.2d 493, 497–98, 384 N.Y.S.2d 804, 807 (1st Dept. 1976). *See also Del Re v. Prudential Lines, Inc.,* 669 F.2d 93, 96 (2d Cir. 1982) (Rule 17(a) ratification does not create new substantive rights but avoids forfeiture if it is unclear which one of two or more parties has a cause of action.). The circumstances of this case do not give rise to a factual issue regarding FOF's intent or purpose to bring suit upon the assigned claims where it previously had no right of action.

### 9. Special Verdict Form

AA contends that the "Special Verdict Form" failed to comply with Fed.R.Civ.P. 49(a) in that it did not ask the jury to enter "a special written finding upon each issue of fact" and failed to comply with Rule 49(b) because it did not cover any issues of fact. However, the "Special Verdict Form" was never intended to satisfy Rule 49(a) or (b).

 Rule 49 is purely permissive; we are not required to submit to the jury forms requiring answers to any issues of fact. *Turchio v. D/S A/S Den Norske Africa,* 509 F.2d 101, 104 (2d Cir. 1974). The jury was instructed that "a verdict sheet" would be given to them, TR 11,749, "to assist . . . in keeping the claims straight." TR 11,784. The jury was further instructed that:

> [Y]ou must answer questions concerning both liability and damages for each of plaintiffs' four different theories of liability, that is, primary violation of the securities laws, aiding and abetting violation of the securities laws by others, common law fraud, and breach of contract.
>
> You are asked to consider each of these theories with respect to plaintiffs' two claims, the overcharge claims and the revaluation claims.

The "Special Verdict Form" was merely a checklist to record a general verdict on each legal claim. *See Miller v. Premier Corp.,* 608 F.2d 973, 982–83 & n.10 (4th Cir. 1979) (District Court utilized the "perfectly serviceable practice" of submitting various discrete general verdict choices to the jury.) Together with the copies of the jury instructions provided to the jurors upon commencing their deliberations, the special verdict form ensured that all the issues would be addressed by the jury.

 In certain circumstances, of course, Rule 49 submissions may be helpful to the jury, the judge, and a reviewing court. *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 279 (2d Cir. 1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). AA suggested that we employ a general verdict form with special interrogatories pursuant to Rule 49(b). However, AA's proposal contained many biased and unhelpful questions. We could not give such interrogatories to the jury. *Cutlass Productions, Inc. v. Bregman,* 682 F.2d 323 at 327 (2d Cir. 1982). Even assuming that interrogatories accurately reflecting the evidence and the factual issues in the case could be drafted, we do not believe that their use was necessary. The factual issues

were not highly technical nor overwhelmingly complex, nor was the case made difficult by numerous affirmative defenses or counterclaims. Thus, the better practice in this case was to provide a form for recording general verdicts on each separate legal claim in issue.

## Evidentiary Rulings

### 1. Main Hurdman Report

 AA contends that admission in evidence of the written report of FOF's expert witnesses concerning AA's compliance with GAAS was prejudicial error.[30] Under Fed.R.Evid. 702, the admissibility of expert testimony requires: (1) that specialized knowledge be of assistance to the trier of fact in understanding the evidence or determining factual issues; and (2) that a witness qualify as an expert by virtue of his or her "knowledge, skill, experience, training or education". *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.,* 505 F.Supp. 1313, 1334 (E.D.Pa.1981). If these criteria are met, such an expert may testify as to an opinion, even concerning an "ultimate issue" of fact. Fed.R.Evid. 702, 704. Mere qualification as an expert is not a license to invade the jury's function by telling the jury what result to reach, *see Marx & Co. v. Diners Club, Inc.,* 550 F.2d 505, 510 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.,* 505 F.Supp. at 1331–32; nor is it appropriate for an expert to supplant the judge's function to instruct the jury on the law. *Marx & Co., supra,* 550 F.2d at 509–510. It is appropriate for experts to testify about the ordinary practices of a profession or trade "to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry". *Id.* at 509 (*citing* VII Wigmore on Evidence § 1949, at 66 (3d ed. 1940)). A thorough review of the Main Hurdman report leaves us with no doubt about its helpfulness and little concern about its objectivity.

 At issue was AA's conduct in failing to discover or, having discovered, failing to disclose [31] material details of the FOF–KRC relationship. GAAS were relevant to but not determinative of AA's duties of inquiry and disclosure. The broadly stated rules were explained in the Main Hurdman report. The qualifications of FOF's experts as knowledgeable, experienced senior accounting partners to testify concerning industry-wide procedural guidelines are not seriously challenged. Of course, it does not undermine the qualification of FOF's experts if AA's expert is *more* qualified (as AA contends). Nor does it detract from the qualifications of FOF's experts that they were inexperienced in oil and gas matters; those experts sought to give content to general prescriptions applicable to all accounting problems. To that end, the subdivisions of the report defined each standard with precision by reference to governing professional bodies, scholarly commentary and interpretive rulings. A representative example of the expert's care in defining GAAS is their treatment of the accountant's duties in reviewing purportedly arm's length transactions. Px–667, pp. 110–120. Each segment of the report proceeds to apply these definitions to AA's conduct. We find that the report is balanced in its treatment of the professional guidelines. *E.g., id.* at pp. 13 (no violation of the co-ownership guidelines), 35 (does not

---

30. We also considered and rejected AA's contention that the expert testimony of Main, Hurdman accountants Ackerman and Johnson was so biased, erroneous and inconsistent as to render the verdict invalid. Most of the instances of inaccurate or inconsistent testimony cited by AA are matters for the jury to consider in weighing the evidence. The jury was specifically instructed to "give the testimony of these witnesses such weight as you may think it deserves" and to assess bias, prejudice, insufficient education or experience. TR 11,671. The problems encountered by the expert witnesses in relating the reasons for their opinions were no more serious or prejudicial than ordinarily encountered by witnesses. AA bases its claim of a miscarriage of justice on little more than effective cross-examination and testimony by its own expert disagreeing with FOF's experts' opinions.

31. By this shorthand reference, we do not mean to limit the issues posed at greater length above.

presume crucial issues of knowledge or intent), 66 (concedes that the language inserted in the IOS Growth financials may be considered a qualification). We especially note the assumption that AA was not engaged in fraud (pp. 5–28) and the comment that AA had reason to be wary of IOS as well as KRC (p. 83). On the whole, the report thoroughly and fairly expresses an expert opinion helpful to the trier of fact.

### 2. Directors' Testimony

Testimony was elicited from various members of FOF's Board of Directors that they would have liked to have known of the differential between King's costs and receipts on sales of natural resource interests to FOF in general and regarding specific purchases. AA objected to the admissibility of this evidence, relying principally on the authority of *Bridgen v. Scott*, 456 F.Supp. 1048, 1063–64 (S.D.Tx.1978). *Bridgen* granted summary judgment after trial for defendant (based on a motion filed before trial). *Id.* at 1066. In reviewing the evidence adduced at trial to determine whether material factual issues could have been raised by plaintiffs before trial to defeat the summary judgment motion, the court discredited plaintiffs "almost identical, vague and self-serving testimony concerning their contentions relating to alleged misrepresentations and concealments . . . and their alleged reliance thereon". *Id.* at 1063. In light of the testimony of plaintiffs' father, "a mature, thoroughly experienced investor, with considerable business experience in many varied activities" who acted for plaintiffs "at all material times", *id.* at 1062, plaintiffs' testimony was not probative. *Id.* at 1063. Moreover, the court found that plaintiffs' testimony was based upon a "gross and misleading oversimplification" of the facts. *Id.* at 1063–64. The court also referred to the principle that "[v]ague, self-serving speculative testimony concerning what a party would have done under different circumstances is generally not admissible". *Id.* at 1063.

While we agree that speculative and self-serving testimony is generally inadmissible, we do not find the directors' testimony inadmissible or unduly prejudicial. The directors were not parties to this suit and did not stand to gain from the allegedly "self-serving" testimony. Whatever moral vindication might be derived by the directors from a verdict for FOF is substantially dissipated by the passage of time. Assuming that the directors have some residual interest in putting their involvement with FOF in the best possible light, we find that the testimony in question is relevant to many of the issues. AA was obligated to determine the basis on which the King-FOF dealings were being conducted and the directors were entitled to know information discovered in the course of AA's audit which directly contradicted the assumptions upon which the directors were conducting transactions with King. That the directors would have liked to have known the information discovered by AA is not speculative. Under Fed.R.Evid. 701, the trial court has substantial leeway to permit lay witnesses to testify in terms of opinions, provided that the opinion is "rationally based on the perception of the witness" and "helpful to a clear understanding of his testimony or the determination of a fact in issue". The present case differs from *Bridgen* in the important respect that the hypothetical questions accurately reflected the underlying facts. To the extent that the facts upon which the questions were based, albeit accurate, reflected FOF's position, AA's cross-examination of the directors would (and did) point up the weakness. The Advisory Committee's Note on Rule 701 contemplates such a process to clarify and challenge lay opinion testimony. In sum, we believe that *Bridgen* is distinguishable, that the directors' relevant and helpful testimony was admissible, and that such testimony was not unduly prejudicial.

### 3. Turnkey Drilling

AA contends that false testimony by FOF's expert and misrepresentations by FOF's counsel resulted in the improper inclusion of evidence concerning six turnkey drilling arrangements in FOF's damage

charts. A "turnkey" drilling arrangement is a fixed price contract whereby the vendor assumes the obligation to drill a well. If the drilling costs exceed the price charged, the vendor's profit is eroded or eliminated. It is not disputed that FOF abandoned any claims for overcharges by the King group for drilling wells and sought damages only for sales of natural resource interests.

We fail to see any "falsehood" or "misrepresentation" concerning FOF's claims. FOF's expert testified that all items on the damage charts were listed as reflected in King's financial records and AA's audit review. TR 10,837–39, 10,843–44. In order for AA to resolve the crucial issues discussed above concerning the relationship between KRC and FOF, it must have considered (and obviously did consider) KRC's characterization of the items. Thus, the inclusion of such matters on the charts is not irrelevant or in bad faith.

■ However, AA's ultimate conclusion has some merit. FOF cannot include these turnkey drilling arrangements in the computation of damages as it wholly abandoned such claims. In this connection, it does not matter how the transaction was labeled for accounting purposes. The overcharge damages attributable to the turnkey drilling arrangements included in Px–743 are:

| Well | Cost to TCC | Avg. Pct. Mark-Up | Price of FOF | Damages or Excess Mark-Up |
|------|------------|-------------------|--------------|---------------------------|
| New Underwood | $ 47,691.00 | 41.12% (1970) | $ 77,400 | $ 10,098.46 |
| Bricker Ranch | 135,315.22 | 50.64% (1969) | 200,000 | ( 3,838.84) |
| North Flank | 99,125.00 | 41.12% (1970) | 238,620 | 98,734.80 |
| Leonville | 280,375.44 | 50.64% (1969) | 402,375 | ( 19,982.56) |
| Brazos | 279,630.00 | 50.64% (1969) | 396,330 | ( 24,904.63) |

Total Deductible from Overcharge Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $108,833.26

As indicated above, the verdict did not include any damage award for overcharges on the Bricker Ranch, Leonville or Brazos interests. The award may only be reduced by amounts found by the jury to have been excessive. There is also one item on Px–740 which was improperly included within the calculation of overcharge damages for the same reason. The Port Gentil permit cost KRC $1,644,110. Addition of the average mark-up for 1969 (the method of damage calculation adopted by the jury) brings the allowable sales price to FOF to $2,133,-233. Subtracting this from the actual sales price to FOF gives the damage award attributable to this transaction: $366,767. Thus, a total of $475,600 should be subtracted from the overcharge award.

### 4. Other Evidentiary Rulings

The following issues raised by AA are adequately discussed on the trial record:

Point XI : Exclusion of Fisher's Testimony — TR 10,007–18

Point XIII : Sending Main Hurdman Report to the Jury — TR 11,863–65

Point XIV : Evidence of "Good Faith" — TR 10,560–62; 10,572–75

Point XIX : Exhibits Regarding Revaluation — TR 11,908–44.

AA's objections are without merit.

### Damages

We have consolidated in this section AA's various objections to the damage award rendered by the jury.

### 1. Measure and Proof of Damages for Overcharges.

■ In our Memorandum Decision dated June 8, 1981, we adopted the out-of-pocket measure of damages as appropriate to the claimed fraudulent overcharges. The theory of FOF's overcharge claim was that the information known to AA, or that AA recklessly failed to discover, showed that KRC and TCC were not adhering to the agreement of the parties in one or more ways. See pp. 1342–1343, 1354–1355 supra. As a result, FOF allegedly paid

more for the natural resource interests than it was obligated to pay. The difference between what FOF paid and what FOF should have paid had the information been revealed to FOF by AA is the proper measure of damages. Our charge to the jury was tailored to the damages suffered as a result of AA's conduct:

> If you find that plaintiffs proved a violation of Section 10(b) or Rule 10b–5 or Section 17(a) with respect to the overcharge claim, plaintiffs may recover the difference between the price paid for the natural resource interests and the price that they should have paid; that is, you should fix the fair value of these interests at the time plaintiffs purchased these interests if the information that was misrepresented or not disclosed were known. Although I previously instructed you not to rely in any way on an alleged agreement to sell at King's cost in assessing liability, King's cost—that is, the price paid by King for the natural resource interests—may be considered as one means of assessing the value of the interests at the time of purchase. Of course, you may also consider any other matters in evidence which may bear on the value at that time.

TR 11,712.

The jury apparently adopted a measure of damages proposed by FOF which calculated the average percentage markup charged by KRC and TCC to other entities and applied that to KRC and TCC's "cost of sales" to FOF. The final damage figure was a reasonable approximation of the difference between KRC and TCC's charges to FOF and the charges that would have been made to FOF had the agreement between the parties insuring price protection according to the prices paid by other knowledgeable industry purchasers been followed. *See Perma Research and Development v. Singer Co.*, 542 F.2d 111, 116 (2d Cir.), *cert. denied*, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1967). The jury reasonably could find that the prices paid by other knowledgeable industry purchasers constituted fair value and that FOF should have been charged prices proportionate to these other sales. Moreover, the evidence showed other factors which might indicate that prices charged to FOF should be lower than the proportionate markup of other interests—for example, the interests sold to FOF were purchased by KRC and TCC during the short time of FOF/KRC dealings specifically for resale to FOF and were resold without significant intervening time for discovery or further exploration. It is not the case that King's markup on sales to FOF should have been higher than to other industry purchasers because FOF was searching for properties with the potential for extraordinary returns, or so-called "elephants." TR 9337–38. One does not generally pay more for a risky venture than a safe one. The most favored nation provision was King's agreement to pass on portions of his interests to FOF at prices not greater than knowledgeable industry purchasers would pay and King himself was among the most knowledgeable industry purchasers. Therefore, the deal he struck arguably made his bargains, FOF's bargains. The jury's approach was a reasonable calculation of FOF's damages.[32]

---

**32.** AA stresses that King's cost was not a meaningful measure of the value of the assets at the time of sale to FOF in part "because plaintiffs have not shown the dates KRC or TCC purchased the properties, or how long such properties had been held by KRC and TCC, or the costs incurred in holding such properties during such period, or from whom the properties had been purchased, or in what market". The damage award as modified by the court does, in fact, take King's collateral costs into account. Information concerning the holding period of the natural resource assets that FOF allegedly failed to prove is relevant only to the extent that intervening strikes or other circumstances would permit the King group to charge FOF a price greater than cost plus average markup. There was evidence from which the jury could find that most interests sold to FOF were purchased by King for that purpose shortly before resale, thus minimizing, if not entirely eliminating, the impact of the proof AA seeks. To the extent that such proof might have been probative, no proof of this sort in mitigation of FOF's claimed damages was introduced by AA.

AA also contends that FOF's damage charts failed to consider the potential value of the

AA also contends that damages cannot be assessed for any of FOF's purchases as AA did not know of each sale until long after they were completed and did not know the relevant cost figures for the King group that FOF claims put AA on notice that something was awry until AA commenced its various audits. Whether one considers this issue as part of the "in connection with", causation or damages elements of securities violations, it is true that conduct occurring or commencing after the transaction is completed is not actionable. *E.g., Morgan v. Prudential Funds, Inc.,* 446 F.Supp. 628, 633 (S.D.N.Y.1978). FOF must demonstrate that AA's conduct was in connection with the purchase of natural resource interests from KRC and TCC or, in other words, that AA's conduct proximately caused FOF's overcharge damages.

■ The evidence shows that AA first became aware of the relationship between FOF and the King group in its year end 1968 audit of FOF. At that time, AA had to resolve any questions concerning principal agreements between FOF and KRC. At least as of March 24, 1969 and, plausibly, prior to February 5, 1969, AA knew or recklessly failed to discover King's violations of the agreement. Thus, any transactions consummated prior to these dates cannot have the requisite causal link with AA's conduct. FOF concedes that three interests were selected and paid for before March 1969. Plaintiff's Brief in Opposition, pp. 95–96 n.61. The amount of the verdict attributable to these three interests, $2,926,096, must be deducted from the damage award. However, AA's actual knowledge of the overcharges at least as of March 24, 1969 is causally related to all subsequent purchases.[33] AA's failure to

clarify the essential terms of the ongoing FOF/KRC relationship, failure to disclose internal accounting deficiencies or failure to disclose the information it possessed reasonably and foreseeably induced FOF to continue to make purchases on the erroneous assumption that a common interpretation of the agreement between the King group and FOF (protective of FOF) governed the securities purchases. AA did nothing after March 1969 to break the direct causal link between its shortcomings and FOF's damages.

■ However, FOF's summary failed to take into account certain significant administrative or overhead expenses for 1969 and 1970 reflected on earlier charts. TR 7610. Over the 1968–70 period, such expenses amounted to $27,104,195 and King's direct cost of sales accounted for in FOF's charts total almost $104 million. King's (legitimate) accounting methods did not attribute overhead costs to specific natural resource interests unless there was a basis for direct attribution. Unless those indirect expenses are added to King's cost of sales, however, FOF will recover as damages from AA an amount in excess of what it could recover from the King group itself. No reasonable juror could expect King to sell interests to knowledgeable industry customers at prices which merely reflect direct costs of acquisition of assets (*e.g.*, purchase price, financing costs, testing, etc.) and would not sustain his basic operations (salaries, computers, etc.). There is no evidence that King's overhead costs were overstated or improper in any way. The damage figures, therefore, should be reduced for KRC's administrative expenses in proportion to KRC's yearly cost of sales to FOF and to other

interests. First, it is highly likely that King's purchase price included an assessment of the value of the interests by a knowledgeable industry purchaser and the jury could find that to have been true. Second, the jury reasonably could find that the potential value of an interest was not the basis upon which pricing was determined according to the FOF/KRC agreement. Third, AA could have shown that different values were appropriate, but did not do so in a timely fashion.

33. We do not agree that the fact that AA did not commence its audit of TCC until year end 1969 requires a finding that AA's conduct was not in connection with or causally related to FOF's transactions with TCC. AA's misrepresentations and omissions concerning the KRC–FOF relationship had direct foreseeable effects upon the future purchases of natural resource interests by FOF from the King group.

entities.[34] According to Px–737, the ratio of KRC's costs of sales to FOF for 1969 and costs of sales to other entities for 1969 is 13.2:48.8 or .270; for 1970, the ratio is 5.1:9.2 or .554. We thus apply these figures to the total yearly expenses unaccounted for in Px–748—$15.1-million for 1969; and $10 million for 1970. For the year 1969, total damages for King's overcharges must be reduced by $4.08 million and overcharge damages must be reduced by $5.54 million for 1970.

Finally, AA contends that the values of FOF's purchases were at least as great as the purchase price, so that damages cannot be awarded. The jury's determination based upon the weight of the evidence and the credibility of the witnesses is supported on the record. We cannot merely disregard the jury's verdict if it is supported by ample probative evidence. AA's contention that the Arctic interests were properly valued and cannot be considered in awarding overcharge damages is not solely based upon a re-weighing of the evidence, but also rests upon an interpretation of the jury verdict regarding the June 30, 1969 revaluation. AA notes that the jury verdict did not award damages for the June 1969 revaluation, and contends that the jury must have accepted the $2.00 per net acre value. A $2.00 per net acre value as of June 30, 1969 is inconsistent with any overcharge damages concerning those interests, it is argued, because FOF's cost for the Arctic interests was approximately $.96 per net acre at about the same time. The jury verdict is not necessarily inconsistent in this respect.[35] The jury reasonably could conclude that there were no securities or common law violations by AA in connection with the June 30, 1969 revaluation for reasons other than the fairness of the price charged to FOF. The jury's finding that a $2.00 per acre valuation was appropriate as of December 31, 1969 and its award of damage for the fraudulent revaluation based upon that figure is not tantamount to a finding of value as of June 30, 1969. Thus, the jury consistently could find AA liable for King's overcharges in the sale of the Arctic interests to FOF and not award damages for the June 30, 1969 revaluation.

*2. Revaluation Damages*

The measure of damages owing to the December 1969 Arctic revaluation presented by FOF and accepted by the jury multiplies the per share effect of the revaluation (held constant despite the decreasing overall value of FOF shares) by the daily number of net redemptions by shareholders. As AA correctly points out, this approach assumes that the entire amount of unrealized appreciation recorded in the revaluation was erroneous. AA argues that the per share value arrived at through the revaluation was accurate, even assuming that the means were improper and that FOF therefore suffered no damage.

There was substantial evidence from which the jury could conclude that the actual value of the Arctic interests was less than $8.01 per share: (1) the logical inference from the fact that King concocted a fraudulent deal; (2) the testimony that Standard Oil Company (Indiana) declined to participate in King's proposed sale in part because of the price; (3) the testimony and exhibits revealing the uncertainties of short-term development in the Arctic—and specifically the difficulty developing King's acreage (TR 6172–78; Dx–5–15); (4) the much lower amount of the June 1969 revaluation and the Sproule appraisal in connection with the June revaluation; (5) the 1970 sale of a portion of King's interest to Sun Oil at a substantially lower price; and (6)

---

**34.** An alternative method of allocating KRC's indirect costs among KRC's various clients might use a ratio of gross sales to FOF and other entities or gross profits on sales to FOF and other entities. We do not consider King's indirect costs in proportion to gross sales or gross profit as those figures were inflated by the fraudulent overcharges.

**35.** We hereby apply the general rule that "a court should reconcile the jury's verdict if at all possible". *Henry v. A/S Ocean*, 512 F.2d 401, 406 (2d Cir. 1975) (*citing Gallick v. Baltimore & Ohio R.R.*, 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963)). On the facts of this case, we have little difficulty in rationalizing what might appear as an inconsistency upon a quick reading.

Texaco's January 1969 purchase of Arctic interests for $7.07 per acre. Although some of the evidence cited by AA in support of its position is hearsay not admissible to prove a value at the time, there is evidence in the record that the $8.01 per acre was accurate or low. TR 866; TR 9938; Dx–A–58; Dx–D–5. Additional proof concerning the speculative nature of the Arctic investments and their possible future returns is equivocal as to the realizable value of the investments in December 1969. *E.g.*, TR 7057–62. The jury's finding that the revaluation was improper and that the $8.01 per acre valuation was not currently realizable is thus supported by the evidence. The value figure adopted by the jury is within the range of values permitted by the evidence although it is close to the bottom of the range. Contrary to AA's contention, FOF did not leave the jury without any basis for computation of actual damages. FOF took two alternative positions, one that the June 1969 revaluation was accurate, but that the December 1969 revaluation was wholly improper and one that the June 1969 revaluation was also improper. The jury adopted the former approach. AA failed to offer probative alternatives (aside from the seriously belated effort to introduce William Fisher's expert testimony on this point). Nonetheless, it is FOF's burden in the first instance to prove compensable damage. As we find the jury's verdict on this point substantiated by the proof, and not contrary to either the quantity or persuasive quality of the remainder of the evidence, we deny AA's motions for judgment n. o. v. and for a new trial.

We also find to be insubstantial AA's contention that the failure of the FOF Board of Directors to change the revaluation after the May 2–3, 1970 meetings obviates recovery for the revaluations after that date. AA maintains that the statements in the year end 1969 financials that the auditor's report was "subject to" the effect of the revaluation and that AA had reviewed the transaction to determine whether it was in accordance with FOF's guidelines necessarily alerted the Board to the possible problems with the revaluation. Clearly that is not the case. Although the draft opinion might have disabused some of the directors of the notion that AA had, in effect, appraised the interests, the auditor's opinion failed to inform the directors that AA had good reasons for questioning the substance and effect of the revaluation arising from its inquiry into the method of the revaluation and its consistency with FOF's guidelines. Without the information known to AA, the directors would not have reason to question the revaluation and could not independently reconsider the substance of the revaluation. Moreover, the directors, exercising due diligence, promptly sought to investigate the transactions underlying the revaluation when doubts arose by retaining Rinfret, Sproule and Donovan, Leisure, although these reports were received after the redemptions were made. Dx–A–58.

### Judgment

Before entering judgment, we reduced the overcharge verdict by amounts obtained in settlement of the multiplicity of disputes between NRC and both TCC and KRC. Memorandum Decision of December 15, 1981, p. 13–14. Our object is to prevent the recovery of an amount greater than actual damages, by considering settlements which are the equivalent of recovery by FOF, or attributable to them, and which concern the same acts at issue herein.

### 1. NRC–TCC Settlement

■■■ We held that the entire NRC–TCC settlement should be applied to the jury verdict as there was no basis in the record to allocate a discrete portion of the settlement to the issues at hand. At this time, FOF argues that the NRC–TCC settlement did not concern the subject matter of their overcharge claims and that a firm basis for allocation of the settlement proceeds exists in the present record to eliminate the deduction previously made. AA contends that the claims released by NRC included the overcharge claims and that further deductions are warranted.

We cannot say that NRC's settlements with TCC and KRC are unrelated to the fraudulent overcharge claims in this case. FOF's chief argument that the verdict should not be reduced by the amounts of NRC's settlements is that NRC did not have any legal right to damages for the overcharge claims. The dispute between FOF and NRC is not a live controversy before us. As a result of the ratification of this suit by NRC pursuant to Rule 17(a), both FOF and NRC will gain as a result of the jury verdict. FOF is not entitled to an advisory determination of the effect of the spin-off of natural resource interests to NRC upon FOF's rights of action. It is also significant that the settlements cut off further development of the fraud claims asserted by NRC against TCC and KRC. Earlier pleadings in this case bear closer resemblance to the statements of claims preceding the settlement than does the second amended complaint upon which damages were based. We should not ignore the evolution of FOF's theory of the case from claims similar to NRC's to the present overcharge claim and we do not find that NRC's formal assertions in the TCC and KRC matters constrict the effect of the settlements to the specific claims thought to be "winners" at the time. The NRC–TCC settlement was effective as to all claims arising out of the relationship between the parties. Thus, we adhere to the rationale of our December 15, 1981 decision and find that the NRC settlements should be applied to reduce the verdict.

We agree that the post-trial evidence conclusively establishes that the $2,950,000 cash received in the NRC–TCC settlement constitutes payment for NRC's 30% interest in the Green Mountain uranium property and is not consideration related to this case and the judgment may not be reduced by that amount. NRC received the cash as its allocable portion of the $10 million sales proceeds. Beatty Ex. C. As the judgment did previously subtract $2,950,000 from the overcharge verdict, such amount must be restored to the judgment.

Our prior decision did not value the other aspect of the settlement due to insufficient evidence. Post-trial discovery authorized by the court has produced more evidence concerning the events surrounding the settlements. The receipt of a 3% overriding royalty interest ("ORRI") by NRC in settlement of all other claims logically includes the fraud claim in this case. Although Beatty Exhibit C–1 excepts the then-existing fraud claim (that TCC received payment for work that was not done) from the calculations of claims that NRC was giving up in the settlement, the fraud claim was not excepted from the release. Thus, the value of the 3% ORRI to NRC at the time of settlement should be deducted from the verdict.[36]

The only evidence before us concerns the value of the 3% ORRI for the Black Warrior interests in Alabama and Mississippi. FOF produced some evidence that a value in the range of $100–250,000 was placed on the ORRI at the time of the settlement, Beatty Exhibits C, C–1, based upon substantially contemporaneous estimates of possible returns of 10 Billion Cubic Feet ("BCF") of natural gas at $1.30 per Thousand Cubic Feet ("MCF") totaling $390,000 without discount to present value. Reycraft Aff. Exhibit 12. Earlier estimates recognized a possible value of $750,000 over 8–10 years, based upon 25 BCF at $1.00 per MCF, or $400,000 present value in 4–5 years. Reycraft Aff. Exhibit 14. In an attempt to show that information available to NRC at the time of settlement supported a greater valuation, AA introduced a chart compiled by NRC at year end 1976, which lists 16 interests in the Black Warrior basis, of which 11 were subject to the ORRI. However, reserve figures are given only for nine of the interests, 5 of which are subject to an ORRI, totaling 197.1 MCF. The chart does not reveal production estimates for the 4 wells successfully drilled by NRC in Black Warrior in 1976. But AA does not offer

---

**36.** AA's extensive submission concerning the actual return realized and future return anticipated by NRC on the 3% ORRI as of year end 1980 is irrelevant. The value of the settlement ought generally to be fixed as of the date of settlement.

any estimate of the Black Warrior net reserves contemporaneous with the settlement contrary to the 10 BCF estimate of NRC. Indeed, AA finds in the 1977 Gruy report an estimate of 12 BCF of net reserves attributable to NRC's interest in Black Warrior. AA has not offered any evidence that a price of $1.00 per MCF or $1.30 per MCF was an inadequate estimate at the time. We thus credit the 10 BCF estimate and use the $1.30 per MCF price, or an undiscounted value of $390,000. The $150,000 discounted value placed upon the ORRI by NRC appears reasonable for all purposes, including reduction of the verdict.

### 2. NRC–KRC Settlement

■ Our December 15, 1981 decision did not reduce the verdict by the value of the NRC–KRC settlement as no evidence of FOF's benefit was produced. AA has conducted discovery and submitted evidence of the value of several elements of the NRC–KRC settlement entered into February 5, 1974 (the "primary settlement"). AA also contends that the consideration exchanged pursuant to an agreement between KRC, Global Arctic Islands, Ltd. ("GAIL") (the successor to NRC's Arctic interests), and Sunoco E & P, Ltd. ("Sunoco") (the "secondary agreement"), entered into on the same date and incorporated by reference in the primary settlement, should reduce the verdict.

Paragraph 8 of the primary settlement changes KRC's net operating profits interest ("NOPI") on all non-producing oil and gas properties wherever located into a 5% ORRI, reduced further by a contractual formula, and changes KRC's NOPI on producing oil and gas properties wherever located into a working interest.[37] Neither aspect of the primary settlement affects the secondary agreement as to the NOPI on the Arctic interests, which is discussed *infra*. The

only inclusive estimates by NRC of the value of the NOPI for U. S. and Arctic interests was $1,375,000. Most of the separate elements of this trade-off were valued individually. A valuation of the NOPI for producing and non-producing U. S. interests is in the range of $500,000 to $1,000,000. A separate assessment of the value of the exchange of the NOPI for the ORRI on non-producing interests placed its value in the range of $500,000–$800,000. FOF's present calculation of the value of the trade-off on non-Arctic, non-producing interests is about $352,000. No estimate was made for the value of the NOPI on producing Arctic interests. Consistent with these estimates, an overall valuation of $1,375,000 for the exchange of the NOPI on U. S. and non-Arctic interests pursuant to paragraph 8 of the primary settlement is fair and reasonable. The verdict shall be reduced by that amount.

■ We turn next to the applicability and valuation of the secondary agreement. KRC, GAIL and Sunoco held undivided interests in the Arctic; both GAIL and Sunoco initially obtained their interests from KRC. These interests were concededly unworkable without resolution of the various claims pending against KRC in the bankruptcy court. The secondary agreement was designed "to settle certain controversies, claims, and lawsuits, and to adjust [the] rights and obligations [of KRC–GAIL–Sunoco] in respect of certain properties, agreements, options and other rights". Beatty Aff., Exhibit E. Both parties agree that the significant aspect of the secondary agreement to GAIL was termination of the NOPI asserted by KRC. FOF contends that the relinquishment of acreage and ORRIs by GAIL in exchange for the termination of KRC's claim to NOPIs was not related to the present overcharge claims.[38]

---

**37.** We do not accept FOF's argument that this aspect of the primary settlement merely resolved the legal dispute concerning the validity of the NOPI. FOF argues that GAIL owned and properly challenged the NOPI as to the Canadian Arctic interests. The interests included in paragraph B of the primary settlement include all properties wherever located. Moreover, FOF's contention that GAIL did not own any overcharge claims and could not have settled them clearly does not apply to this arrangement between NRC and KRC.

**38.** FOF also argues the merits of the dispute

We hold that, as a matter of fact, the secondary agreement concerning the NOPI for the Arctic interests is not the equivalent of recovery by FOF for the overcharge claims at issue. The legality of the imposition of a NOPI under Canadian law was a matter of heated dispute between NRC and KRC. The exploitation of the Arctic interests was inhibited primarily by KRC's lack of cash to pay working obligations and title questions. NRC, which had been making required payments for KRC, refused to do so any longer, thus introducing a threat that interests might be forfeited. In order to begin to develop the interests, NRC settled the NOPI issue with KRC. KRC was provided with some working interests and ORRIs which were immediately transferred to Sunoco for cash and work credit, easing KRC's tight cash flow position. Sunoco also gave NRC a $7-million work credit. Sunoco took charge of the development program, replacing KRC. After the dust settled, KRC had operating cash and work credits, Sunoco had additional interests and management authority, and NRC eliminated the dispute concerning the legality of the NOPI. The way was cleared for development. The "Roche trade" upon which the secondary agreement was built did not compensate NRC for settlement of the fraudulent overcharge claims (or other related claims which subsequently matured into the overcharge claims).

 We reject AA's argument that the cancellation of the KRC de Mexico $1,000,-000 note held by Global resulted in a net benefit to Global which should be deducted from the verdict. Simply put, there is no evidence connecting the note to the claims upon which FOF recovered herein. Savings owing to cessation of litigation also are not deductible.

### 3. Allocation of Proportionate Fault

 A separate matter relating to the judgment concerns the reduction of the

verdict sought by AA for the proportionate fault of various joint tortfeasors who were not parties to this action. Our decision of December 15, 1981 explained that a reduction for the proportionate fault of others was inappropriate unless the alleged joint tortfeasors were "in some way brought into the original suit", although a separate action was available to decide such questions, and that the record did not permit "the necessary factual findings of relative fault" even if we could decide issues of proportionate fault concerning non-parties alleged to be joint tortfeasors. Neither point is startling or without precedent. The Fifth Circuit has reduced substantially the same issue as the former issue to six simple principles:

(1) Where concurrent fault of two or more persons combine to produce injury, the parties at fault are joint tortfeasors and, as such, are liable to the injured plaintiff.

(2) The Federal Rules of Civil Procedure have liberalized joinder and impleader rules . . . to facilitate the presence of all interested parties in one action. All potential joint tortfeasors may be made third party defendants, pursuant to Rule 14(c). Application of the Rule in this manner is the only possible interpretation of it consistent with its purpose and intent.

(3) Where there are two or more defendants (alleged joint tortfeasors), and the plaintiff settles with and grants a release as to one or more of them, reserving his rights against the remaining, the settling defendants are relieved of any further liability to the plaintiff.

(4) When two or more parties have contributed by their fault to cause injury to another, the liability for such damage is to be allocated among the parties propor-

between NRC and FOF concerning which party could assert the overcharge claims. We reject the latter argument for the reasons stated above. FOF is not entitled to an advisory opinion determining the disputed right to assert various claims between NRC and FOF. By

virtue of NRC's ratification and the division of any proceeds resulting from this suit, NRC's settlement of the KRC bankruptcy is attributable to FOF if the claims settled are related to this suit.

tionately to the comparative degree of their fault.

(5) A tortfeasor seeking to assert a reduction by the degree of fault of alleged joint tortfeasors must prove by a preponderance of the evidence that the settling defendant was, in fact, at fault.

(6) A settling party's negligence is considered only when he has been made a party to the suit. In such a case, the judgment awarded to the claimant against the nonsettling defendant is credited with the dollar amount represented by the proportion of negligence, if any, attributed to the settling parties.

*Leger v. Drilling Well Control, Inc.,* 69 F.R.D. 358, 362–63 (W.D.La.1975) (footnotes omitted), *aff'd,* 592 F.2d 1246, 1248 (5th Cir. 1979) (adopting District Court's "scholarly approach"). We touched upon each of these principles, except for number one, in our prior decision. The first principle has been recognized by numerous decisions. *E.g., Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 260 & n.8, 271 n.30, 99 S.Ct. 2753, 2756 & n.8, 2762 n.30, 61 L.Ed.2d 521 (1979) (common law and admiralty); *Slotkin v. Citizens Casualty Co.,* 614 F.2d 301, 317 (2d Cir. 1979) (New York law); *Mattschei v. United States,* 600 F.2d 205, 209 (9th Cir. 1979) (California law). Contrary to AA's contentions, each joint tortfeasor can bear individual liability for plaintiff's total damages, *Liberty Mutual Ins. Co. v. Vanderbush Sheet Metal Co.,* 512 F.Supp. 1159, 1166 n.3 (E.D.Mich.1981); *Migues v. Nicolet Industries, Inc.,* 493 F.Supp. 61, 64 (E.D.Tx.1980), at least until the liability of joint tortfeasors is established, *see e.g., In re National Student Marketing Litigation,* 517 F.Supp. 1345, 1347–48 (D.D.C. 1981), or payment is made, *see generally, Heizer Corp. v. Ross,* 601 F.2d 330 (7th Cir. 1979). Cases also support our alternative conclusion that evidence sufficient to make a determination of relative culpability is required before the issue can be submitted to the jury. *Liberty Mutual Ins. Co. v. Vanderbush Sheet Metal Co.,* 512 F.Supp. at 1165–66 (In a separate suit against a subcontractor by an insurer which previously satisfied a judgment in favor of the subcon-

tractor's employee against the general contractor wherein the general contractor was adjudged 90% liable, subcontractor's liability was an open question (not limited to a portion of 10%) as the subcontractor was not a party and did not have evidence about it introduced at prior trial.); *Payne v. Gould,* 503 F.Supp. 1060, 1061 (E.D.Tx.1980) (third-party claims for contribution not sent to jury due to lack of evidence). Thus, we adhere to our prior decision.

### Conclusion

We grant AA's motion for judgment notwithstanding the verdict concerning the primary violation of section 17(a)(3) and aiding and abetting violations under sections 17(a)(1), 17(a)(2) and 17(a)(3) concerning the revaluation claims. We also grant judgment n. o. v. with respect to several particular items of damage included in the verdict. *See* pp. 1374, 1376, 1379–1380 *supra.* In all other respects, we deny AA's motion. We also deny the motion for a new trial. Our extensive review of the record and assessment of the impact of our many rulings does not convince us that the jury verdict was erroneous or a miscarriage of justice.

SO ORDERED.